HANSEN, JONES & LETA,
P.C., Appellant,

v.

Roger G. SEGAL, Trustee, Appellee.

SNELL & WILMER, L.L.P., Appellant,

v.

Roger G. SEGAL, Trustee, Appellee.

Nos. 2:96–CV–572–B, 2:96–CV–573–B.

United States District Court,
D. Utah,
Central Division.

Feb. 18, 1998.

David B. Watkiss, Watkiss Dunning & Watkiss, P.C., Salt Lake City, UT, Richard A. Derevan, Snell & Wilmer, L.L.P., Irvine, CA, for Snell & Wilmer L.L.P.

Vernon L. Hopkinson, Julie A. Bryan, Cohne, Rappaport & Segal, P.C., Salt Lake City, UT, for Roger G. Segal, Trustee.

### ORDER

BRETT, District Judge.

On July 1, 1996, Hansen, Jones & Leta, P.C. ("HJ & L") and Snell & Wilmer, L.L.P. ("S & W"), former counsel for bankruptcy debtor, Bonneville Pacific Corporation ("BPC"), filed their appeals from the bankruptcy court's denial of compensation for their services and costs. The appeals were assigned to this Court on February 3, 1997. The Court consolidated the appeals on March 17, 1997, as both appeals arise from the representation of BPC by David E. Leta ("Leta") as its general counsel in the bankruptcy proceedings. HJ & L represented

BPC from December 4, 1991 through March 31, 1992, when Leta left HJ & L to become a partner at S & W. As Leta was the attorney responsible for the representation of BPC, S & W took over as BPC's general counsel on April 1, 1992. The fee applications of both firms were submitted to and denied by the bankruptcy court. In June 1997, HJ & L entered into a settlement with appellee Roger G. Segal (the "Trustee"), which resulted in the court-approved dismissal of HJ & L's appeal on July 21, 1997. Consequently, the only appeal before the Court is S & W's appeal of the denial of its fees and costs, which was argued before the Court on July 8, 1997.

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a), and reviews the bankruptcy court's denial of compensation for abuse of discretion. *In re Interwest Business Equipment, Inc.*, 23 F.3d 311, 315 (10th Cir.1994). The orders appealed from are the initial order of December 1, 1992, published at *In re Bonneville Pacific Corp.*, 147 B.R. 803 (Bankr.D.Utah 1992), denying all appellants' pending fee applications and requiring the disgorgement of fees and costs already paid (*"Bonneville I"*), and the order of May 22, 1996, published at *In re Bonneville Pacific Corp.*, 196 B.R. 868 (Bankr.D.Utah 1996), denying appellants' motion to alter or amend the denial of their fee applications (*"Bonneville II"*).

HJ & L is no longer a party to this appeal. However, since the bankruptcy court's two decisions denying compensation rely on findings involving Leta's conduct while he was associated with both HJ & L and the remaining appellant, S & W, the Court focuses its review on Leta's role in the underlying proceeding, without reference to his associated firm. Further, because that role changed with the appointment of the Trustee on June 12, 1992, the Court divides its review into two parts: Leta's employment as general counsel

for BPC as debtor-in-possession from December 4, 1991 through June 11, 1992; and his appointment as special counsel to the Trustee from June 12, 1992 through November 30, 1992.[1]

For the reasons set forth below, the Court affirms the bankruptcy court's disallowance of fees and costs incurred by S & W while employed as general counsel for BPC as debtor-in-possession and reverses the bankruptcy court's disallowance of S & W's fees and costs while employed as special counsel to the Trustee.

## I.

### A. Bonneville Pacific Corporation

BPC was founded in 1980 as an independent energy producer. [AA Tab 13 at 475].[2] Its original founders were Raymond L. Hixson ("Hixson"), L. Wynn Johnson ("Johnson"), Robert L. Wood ("Wood"), Carl T. Peterson ("Peterson"), John T. Dunlop ("Dunlop") and Deedee Corradini ("Corradini"). [AA Tab 40 at 1786; AA Tab 42 at 2047]. BPC's primary business focused on the development and operation of cogeneration and alternative energy facilities. Cogeneration facilities produce two or more forms of energy (e.g., electricity and steam) from a single source of fuel; alternative energy facilities produce energy through non-fossil fuels, such as geothermal, hydroelectric and bio-mass technologies. [AA Tab 40 at 1788]. From 1982 through 1991, BPC developed and placed into operation 29 separate energy projects and started construction on three others. [AA Tab 13 at 475].

By the fall of 1991, BPC, principally a holding company, either owned or had partnership interests in approximately 43 corporations and partnerships, and was involved in more than 350 separate executory contracts. [AA Tab 18 at 809–16, 902–40]. BPC and its

---

**1.** Although Leta's conduct while he was with HJ & L is before the Court, HJ & L's request for fees is not. The fee applications at issue, therefore, are those of S & W for the period of April 1 through October 31, 1992 and include $44,528.20 in fees and $276.86 in costs in the second interim application [AA Tab 9]; $163,167 in fees and $7,264.67 in costs in the third interim application [AA Tab 10]; $30,789 in fees and $861.39

in costs in the fourth interim application [AA Tab 11]; and $10,182.10 in fees and $3,647.11 in costs in the fifth interim application [AA Tab 12].

**2.** The Court refers to Appellant's Appendices as "AA," Appellee's Appendix as "RA," and the record transcript as "RT."

various subsidiaries were a tightly integrated operation, with interlocking officers and directors, centralized accounting, and intercompany debt. [RT 54–55 (2/17/93)]. Bonneville Services Corporation, a wholly-owned subsidiary, maintained and operated BPC's various facilities. BPC also operated in three other industries through its subsidiaries: Bonneville Fuels Corporation in gas property acquisitions to supply BPC and its affiliates with natural gas; Bonneville Foods Corporation in food industry acquisitions to purchase steam or hot water from BPC's electric generating facilities; and RECOMP, Inc., in the development of waste processing and in-vessel organic composting operations. [AA Tab 40 at 1788–90].

BPC went public in 1986, and by late 1991 sold over $100,000,000 of securities in three public offerings. [AA Tab 42 at 2048]. BPC's financial statements for the offerings and its annual reports were audited by the accounting firm Deloitte, Haskins & Sells ("Deloitte").

In the fall of 1990, Portland General Holdings, Inc. ("Portland General"), an Oregon-based utility, acquired 46% of BPC's stock for $49 million and over the course of the next year loaned BPC $26 million. [AA Tab 13 at 476; AA Tab 20 at 1356, ¶¶ 49,50]. With this acquisition, Portland General effectively controlled BPC, replacing three BPC representatives on BPC's board of directors with Portland General representatives, and placing Portland General employees in key officer positions at BPC. [AA Tab 47 at 2439–44; AA Tab 13 at 476; AA Tab 40 at 1787–88; AA Tab 42 at 2049].

On November 11, 1991, Portland General, after conducting an internal investigation into BPC's financial affairs, withdrew all of its financial and management support. The next day, all Portland General directors resigned and Portland General employees left. Because this incident precipitated an immediate liquidity problem, BPC concluded that it had to file a voluntary petition under Chapter 11 of the Bankruptcy Code. [AA Tab 13 at 476; RT 56–57 (2/17/93); AA Tab 47 at

2441–44; AA Tab 40 at 1793]. A few weeks after the Portland General pullout, BPC hired Buccino & Associates ("Buccino"), a crisis management and turnaround consulting firm, to work with management to deal with the financial crises. [RT 51–52 (2/17/93)].

## B. BPC's Bankruptcy Filing, Appointment of Counsel, Other Professionals and Unsecured Creditors' Committee

On December 5, 1991, BPC filed Chapter 11 bankruptcy. At that time, there were five (5) directors sitting on BPC's Board of Directors: Ralph F. Cox, Calvin L. Rampton, Johnson, Wood and Dunlop. [AA Tab 40 at 1879; AA Tab 42 at 2061]. Wood was also President and Chief Operating Officer ("COO") of BPC until the Board, with the concurrence of Buccino, appointed Clark Mower ("Mower") as President and COO on January 17, 1992.[3] [AA Tab 40 at 1880; AA Tab 42 at 2030–31]. Other BPC officers included Gerald Hansen as Executive Vice-President; Robert Malone as Vice-President of Engineering, Construction and Operations; Mark Rinehart ("Rinehart") as BPC's Vice-President, Secretary and General Counsel; and Gerald C. Monson ("Monson") as Vice-President, Accounting. [AA Tab 42 at 2060, 2070–73].

BPC intended that Mayer, Brown & Platt ("Mayer, Brown"), which had long represented BPC in corporate and securities matters, act as its general counsel in the bankruptcy, representing BPC and all of its various subsidiaries and affiliates. [RT 161 (2/24/93 p.m.)]. One of the partners at Mayer, Brown suggested that BPC retain Leta in the firm of Hansen Jones & Leta, P.C. in the limited role of local counsel. [RT 161–63 (2/24/93); RT 45–47 (2/17/93)]. Leta had had no prior relationship with BPC. [RT 48–49 (2/17/93)]. When Leta first met with representatives from BPC, Mayer, Brown, and Buccino on December 4, 1991, the decision to file a Chapter 11 petition and to retain Mayer, Brown as general counsel had already been made. [RT 50–54 (2/17/93)]. At this meet-

---

**3.** Wood was briefly replaced as President and COO by Richard Cattau of Buccino & Associates on December 4, 1991, but was reinstated as President and COO the same day. [AA Tab 40 at 1879–80 n. 1].

ing, a discussion was held regarding the propriety of Mayer, Brown representing both BPC and its subsidiaries. Leta noted that there was case authority in the District of Utah which might result in the denial of Mayer, Brown's application to represent BPC and its nondebtor subsidiaries. [RT 54–55 (2/17/93)]. However, BPC's initial exparte applications to employ counsel sought to have Mayer, Brown appointed as general counsel for BPC and its subsidiaries, and HJ & L appointed as local counsel only. [AA Tabs 1 and 2].

At a hearing on December 9, 1991, the bankruptcy court denied Mayer, Brown's application, holding that Mayer, Brown could not represent both the interests of BPC as debtor-in-possession and those of non-debtor subsidiaries.[4] [RT 57–58 (2/17/93)]. BPC then submitted other applications that same day seeking to employ HJ & L as general counsel and Mayer, Brown as special counsel which the bankruptcy court denied because Mayer, Brown's role as special counsel was too broad. [RT 58–59 (2/17/93); AA Tabs 3, 4 and 5]. The second applications were then amended to limit the scope of Mayer, Brown's employment to four specific tasks, which the bankruptcy court approved. [AA Tabs 6 and 7]. Thus, with the court's approval, Leta was retained as BPC's general counsel and Mayer, Brown as special counsel.

On January 17, 1991, the United States Trustee appointed the following as members of the Unsecured Creditors' Committee in the BPC bankruptcy:

L. LeGrand Price (Chairperson)—Debenture Holder

C. Derek Anderson—Debenture Holder

Caisse Nationale DeCredit Agricole—Senior Unsecured Debt

The Chase Manhattan Bank, N.A.—Senior Unsecured Debt

Ebasco Services Inc.—Trade Debt

S. Whitfield Lee—Debenture Holder

.Valley Bank & Trust Co.—Senior Unsecured Debt

[AA Tab 42 at 1796]. The committee was represented by Ralph R. Mabey ("Mabey") and his law firm, LeBoeuf, Lamb, Leiby & MacRae; Ernst & Young was employed as the committee's accountant. [AA Tab 40 at 1796].

After BPC filed bankruptcy, Buccino continued in the role of financial consultant for the debtor with the approval of the bankruptcy court and commenced a "comprehensive, preliminary assessment" of BPC's assets. [AA Tab 40 at 1793]. In late January 1992, Buccino completed its initial report. In that report, Buccino estimated that BPC's assets, which had been listed in the Summary of Schedules filed in the bankruptcy case with a book value in excess of $250 million,[5] actually had a fair market value of $22–45 million. [AA Tab 19 at 1047, 1050–52; AA Tab 18 at 818]. This evaluation was presented to the creditors' committee and its counsel Mabey, and to BPC representatives and its counsel on January 28, 1992. [AA Tab 40 at 1794; AA Tab 19 at 946].

## C. Course of the Bankruptcy Case

Given the size and complexity of BPC's bankruptcy and Leta's lack of history with the debtor, Leta concentrated his efforts as general counsel on the following priorities: (1) insuring that BPC complied with the administrative responsibilities imposed on Chapter 11 debtors, including responding to the Operating Guidelines and Reporting Re-

---

4. Mayer, Brown and HJ & L appealed the order denying the initial application. The order was affirmed by the Utah district court. BPC withdrew from its appeal to the Tenth Circuit which was consolidated with other parties in *In re Interwest Business Equipment, Inc.*, 23 F.3d 311 (10th Cir.1994).

5. In the original Summary of Schedules filed by Leta on December 20, 1991, BPC's total assets were listed as $252,554,163.00, footnoting that the "[v]alues stated herein are carrying values on Debtor's books as of December 4, 1991. (prelimi-

nary; unaudited)." [AA Tab 18 at 818–19]. Leta later filed two amendments to the schedules. The First Amendment to Schedules, filed on January 17, 1992, stated BPC's total assets as $256,887,291.49. There is no footnote to this amendment reflecting that the values were book values. [Trustee's Record on Appeal, Docket 99]. The Second Amendment to Schedules filed on April 10, 1992, again listed BPC's total assets as $256,887,291.49. Again there is no footnote informing that the listed values were book values. [AA Tab 36 at 1513–14].

quirements [AA Tab 42 at 1793; RT 77 (2/17/93)]; (2) working with Buccino to determine how best to preserve existing company assets and avoid loss of value; and (3) determining a viable plan of reorganization. [AA Tab 49 at 2476–77; RT 144 (2/17/93)]. From December 1991 until the Trustee was appointed in June 1992, Leta and his firms provided over 2000 hours of legal services, which included assisting in preparing statements and schedules and amendments to those schedules; preparing and reviewing applications for other professionals employed in the case; meeting with the creditors' committee; reviewing executory contracts to determine whether to accept or reject them; negotiating sales of various assets; negotiating office leases; negotiating with creditors; dealing with BPC employment and payroll issues; reviewing indemnification and insurance issues; and pursuing and defending litigation involving BPC. [AA Tabs 8–10; RT 33–47 (2/18/93 a.m.); RT 16–26 (2/18/93 p.m.); RT 20–31 (2/19/93)].

### 1. Litigation in the bankruptcy case

Two litigation matters are pertinent to this Court's review: (1) the settlement of lawsuits arising from the foreclosure of the "Magic Valley" project, a small hydroelectric facility near Twin Falls, Idaho, owned and operated by Magic Valley Hydro Electric Partners Limited 1984 ("Magic Valley"), a Utah limited partnership whose general partner was BPC, [RT 145 (2/17/93); AA Tab 23]; and (2) the complaint filed by Portland General in Utah state court on January 22, 1992, against BPC insiders Wood, Johnson, Dunlop, and Monson, and BPC's accounting firm Deloitte alleging insider fraud and malfeasance [AA Tab 20]. When BPC filed its petition in bankruptcy, the law firm of Parsons, Behle & Latimer ("Parsons, Behle") was defending two lawsuits relating to Magic Valley. [RT 146 (2/17/93)].

### (A) Magic Valley

On February 18, 1992, Leta, on behalf of BPC, general partner of Magic Valley, filed a motion seeking authority to compromise the lawsuits arising from the foreclosure of the Magic Valley project. Under the terms of the proposed settlement, BPC agreed to waive $2.3 million carried on its books as a receivable and surrender the project to the lender in exchange for a cash payment of $270,000.00. Because the settlement required dissolution of Magic Valley, the consent of the limited partners was required. On February 24, 1992, Leta discovered that seven Mayer, Brown partners were limited partners of Magic Valley. [RT 151–58 (2/17/93); AA Tab 24 at 1457]. Leta contacted Mayer, Brown and requested that they obtain the consent of these partners so that settlement could be effected. [RT 152–56 (2/17/93); AA Tab 24 at 1458]. When consent from the limited partners was not forthcoming, BPC decided to pay $70,000 to all the limited partners of Magic Valley to obtain consent to settlement. [RT 149–54 (2/17/93)]. Accordingly, when the motion was argued before the bankruptcy court on February 27, 1992, Leta asked that the settlement terms be modified to permit payment of a total of $70,000 to the limited partners. Although Leta disclosed the terms of the settlement, he never identified Mayer, Brown's involvement to the bankruptcy court, the creditors' committee, or the examiner and trustee who were later appointed. [RT 182–83 (2/19/93); RT 161–65 (2/25/93)].

After the hearing, Leta learned that the Mayer, Brown limited partners and their clients who also invested in Magic Valley were still not willing to consent without assurance that the settlement would not leave them open to additional liability. Leta agreed to render an opinion for the Mayer, Brown limited partners. [RT 159–63 (2/17/93); AA Tab 28 at 1481–82]. He did so and was paid for this service by Mayer, Brown. [RT 161–63 (2/17/93); AA Tabs 31 and 32 at 1491–92]. Leta did not disclose to the court or anyone else involved in the bankruptcy case that his firm rendered this opinion, nor did he file a supplemental statement under Bankruptcy Rule 2016(b) as is required when previously undisclosed payments are made to debtor's counsel. [RT 163 (2/17/93)].

### (B) Portland General

On February 26, 1992, BPC, with the support of the creditors' committee, filed a Mo-

tion for Temporary Restraining Order and Preliminary Injunction seeking to stay the Portland General litigation.[6] [AA Tab 22 at 1410; RT 169–71, 181–83 (2/17/93); RT 19–23 (2/18/93 a.m.); RT 92–93 (2/23/93 a.m.)]. The bankruptcy court issued a temporary restraining order and scheduled a hearing on the preliminary injunction for March 5, 1992. [RT 184 (2/17/93)]. During the period between the TRO and the hearing, BPC and Portland General tried to resolve the matter but negotiations foundered on Portland General's insistence that BPC not seek any extension of the exclusive period to file a reorganization plan. [RT 184–85 (2/17/93)].

At the hearing on the motion, Portland General argued that its suit should not be enjoined because BPC insiders, Wood, Johnson, Dunlop and Monson, continued to run BPC and no independent investigation of Portland General's allegations of fraud had been initiated by the debtor. [RA Tab 7 at 115–17]. Rinehart testified that BPC had not at that point investigated the allegations against Wood, Johnson and Dunlop or Deloitte [RA Tab 7 113–14; RT 115–16 (2/18/93 a.m.); Supp.AA Tab 2 at 197–98], but that BPC had hired Mayer, Brown to advise it with respect to the Portland General complaint and that the scope of Mayer, Brown's tasks included investigating the claims. [RT 16–17 (2/18/93 a.m.); Supp.AA Tab 2 at 210–11]. Mower testified that Wood, Johnson, and Dunlop were the "collective memory" of BPC; Monson was required for day-to-day operations; and thus all were essential to reorganization efforts. [RA Tab 7 at 109–14; RT 5–7, 10–11 (2/18/93 a.m.); RT 88 (2/24/93); Supp.AA Tab 2 at 47–51]. Leta therefore argued the Portland General suit should be enjoined until August 31, 1992 or until a reorganization plan was confirmed, so the individual defendants could continue to assist in the successful completion of BPC's reorganization. [Supp.AA Tab 2 at 219–46]. The bankruptcy court denied the motion on April 1, 1992.[7]

6. The motion was amended on March 2, 1992 to request an injunction through August 31, 1992 or until a plan was confirmed, whichever occurred first. [RT 186 (2/17/93); AA Tabs 21 and 22].

7. In late April 1992, BPC, represented by Parsons, Behle, filed a complaint against Portland

## 2. Harris Investigation

Within two weeks after the injunction hearing, on March 16, 1992, Mower informed Leta of an embezzlement by Dunlop, a BPC director and President of RECOMP, a BPC subsidiary. [RT 6, 59–60 (2/18/93 a.m.)]. Mower had initiated an investigation headed by BPC employee Dale Harris ("Harris"), and Dunlop had admitted to Harris that he had committed a million dollar defalcation with funds from RECOMP. [RT 9–13 (2/24/93 a.m.); RT 95–96 (2/25/93)]. Mower, Leta, and the Mayer, Brown lawyers collectively decided to terminate Dunlop immediately; deny him access to the premises; sequester all of the books and records of RECOMP; make sure the records had not been altered; make a report to the FBI; and seek permission from the bankruptcy court to employ a special accountant to do a cash audit to determine if there were any other incidents of misuse of RECOMP's funds. [RT 59–60 (2/18/93 a.m.); RT 58–59 (2/24/93 a.m.)]. Leta prepared the letter directing Dunlop to step down. [RT 18 (2/24/93 a.m.)]. Leta also prepared an ex-parte motion seeking authorization for BPC to hire an independent CPA, Warren Christensen ("Christensen"), as a special auditor on behalf of BPC regarding the RECOMP matter. [RT 62 (2/18/93 a.m.); RT 136 (2/23/93 p.m.); RT 97–98 (2/25/93)].

At a special Saturday session on March 21, 1992, Rinehart and Mabey informed the bankruptcy court of what had occurred, and presented the ex-parte motion, which was approved by the court. Once his appointment was approved, Christensen began a complete cash audit of RECOMP. BPC also expanded the Harris' investigation to include all potentially questionable transactions, i.e., related party transactions involving BPC insiders generally. [RT 11–12 (2/25/93); RT 94 (2/24/93 a.m.)].

General in Utah federal district court crediting BPC's demise to Portland General. [RT 183–85 (2/23/93)]. The Trustee later elected to pursue this claim. [AA Tab 47 at 2451].

Leta was excluded from the Saturday meeting with the bankruptcy court because Mabey requested that the meeting be kept small, and because BPC was considering replacing Leta with another attorney, Herschel J. Saperstein ("Saperstein"), Rinehart was concerned that the topic might come up. [RT 120 (2/24/93 p.m.); RT 28–29 (2/25/93)]. Although BPC had considered replacing Leta as general counsel as early as February 1992 because of its communication problems with Leta and dissatisfaction with the results of the bankruptcy proceedings at that point, Leta was not informed of this intention until March 30, 1992.[8] [RT 63–64 (2/18/93 a.m.); RT 29–30 (2/25/93)].

### 3. Appointment of Examiner

Both the Christensen and Harris investigations continued through the first week in April, when an examiner was appointed. On April 6, 1992, at a hearing on fee applications, the bankruptcy court, expressing concerns over inconsistent information relating to the status of the debtor as well as BPC's plan to change counsel, ordered the immediate appointment of an examiner to conduct an independent investigation. [AA Tab 16 at 646]. In so doing, the court noted that "I'm not in the least way being critical of counsel for the debtor in this case because I wonder if general counsel for the debtor is being fully informed by the debtor and being asked to advise concerning all relevant matters." *Id.* On April 9, 1992, the court named Alan Funk ("Funk") as examiner. As a result of the examiner's appointment, BPC, with the consent of the creditors' committee, deferred its internal investigations to that of the examiner. [RT 53, 84–85, 89–90 (2/18/93 a.m.); RT 22–23, 34–36 (2/23/93 a.m.); RT 195 (2/24/93 p.m.)].

### 4. Motion to Extend Exclusivity Period

BPC and the creditors' committee filed a joint motion to extend the exclusivity period[9]

from May 18, 1992 until June 10, 1992. [AA Tab 39; RT 69–71 (2/24/93 a.m.); RA Tab 8 at 127]. The joint application was supported by declarations from Irving Thau (financial advisor to the creditors' committee), Lee Price (chairman of the creditors' committee), Mower and Funk, all of whom stressed Mower's control of BPC and his cooperation in the reorganization. [AA Tab 39]. Funk also stated that his review to date had revealed "no reason to question Mr. Mower's integrity." [AA Tab 39 at 1748]. Mower believed it was essential to file a plan within the exclusivity period and the creditors' committee agreed. [RT 69–70 (2/24/93 a.m.)].

Mabey prepared and argued the motion at a May 14, 1992 hearing and conducted the examination of Thau, as representative of the creditors' committee, and Mower as BPC's representative. [RA Tab 8]. Thau and Mower testified that the business transactions of BPC were not sufficiently advanced to allow a fair estimate of the size of the estate which would form the basis of the plan. [RA Tab 8 at 141, 157–59, 181]. Leta and Mabey informed the court that Wood had tendered his resignation to BPC's Board on May 8, 1992, and his resignation needed to be approved to facilitate reorganization efforts. [RA Tab 8 at 127–28, 183–84]. Finally, Mabey advised that if the motion were denied, a plan would be filed on May 19, 1992 because the risk was too great "that some other plan might be filed by some other party in interest." [RA Tab 8 at 182–83; RT 48–49 (2/18/93 p.m.)].

The bankruptcy court denied the request for an extension. [RA Tab 8 at 189–90]. The court noted that an extension to file a plan had already been granted and there were enough professionals working on the plan to have had a plan filed within that time and to have located assets of the estate. [RA Tab 8 at 189–90]. The court admonished

---

8. Saperstein was never appointed by the bankruptcy court. On May 1, 1992, the court held a hearing on Saperstein's appointment. Although all the parties spoke in favor of his being retained, the bankruptcy court deferred ruling until the examiner's report was received. [AA Tab 50 at 2532; RT 54 (2/18/93 p.m.)]. Shortly thereafter, the court appointed the Trustee.

9. The "exclusivity" period refers to the 120 days after the date of the order for relief in which only the debtor can file a proposed reorganization plan. 11 U.S.C. § 1121(b).

that it would consider any plan that was incomplete and unconfirmable and filed just to protect the exclusivity period a plan not filed in good faith. [RA Tab 8 at 190]. Leta filed a disclosure statement and proposed plan on the May 18, 1992 deadline. [AA Tab 40; RT 55–86 (2/18/93 p.m.)]. The plan was not a consensual plan. [RT 93 (2/22/93); AA Tab 17 at 776–77].

### 5. Examiner's Report and Appointment of Trustee

On May 28, 1992, Funk filed the Examiner's Report under seal. [AA Tabs 42 and 43]. The report found no wrongdoing on the part of BPC's current management but did find evidence of fraud by former management, including Wood, Dunlop and Johnson,[10] which had impacted many of BPC's assets. [AA Tab 42 at 2178—2223; AA Tab 43 at 2223–2315, 2354–55; RT 155–56 (2/23/93 p.m.)]. The report also disclosed prepetition payments to Mayer, Brown and Parsons, Behle, and to insiders in the year preceding bankruptcy, which had not been pursued. [AA Tab 43 at 2141, 2143, 2153–66, 2342–47]. The examiner made no recommendation regarding claims against Portland General but did recommend against the appointment of a trustee because of the steep learning curve required due to the complexity of the case. [AA Tab 42 at 2038; RT 68–70 (2/17/93); AA Tab 43 at 2355–57; RT 93 (2/18/93 p.m.)].

Leta did not receive a copy of the examiner's report until June 4, 1992. [RT 91–92 (2/18/93 p.m.)]. Based on the evidence of insider fraud in the report, Leta arranged that the head of S & W's litigation department meet with BPC's current management on June 12, 1992 to determine how best to prosecute claims and recover assets. [RT 95–97 (2/18/93)].

Also as a result of the examiner's report, Mabey and his firm filed an Application to Withdraw as Counsel for the creditors' committee on June 10, 1992. [RA Tab 9 at 191–93]. The application stated that

3. On May 28, 1992, the Examiner filed with the court his preliminary report which includes several statements concerning connections with Deedee Corradini, the spouse of Yan M. Ross, an attorney who is of counsel at LeBoeuf, with entities that may be related to the debtor.

4. In light of the Examiner's Report, LeBoeuf has decided that it cannot continue to effectively represent the committee. This decision is not based on the fact that LeBoeuf is not a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code or that it has an interest adverse to the estate. Rather, under the "appearance of impropriety" standard set forth in *In re Roberts,* 75 B.R. 402, 405 (D.Utah 1987), LeBoeuf believes it should withdraw. . . .

[RA Tab 9].

On June 11, 1992 the bankruptcy court conducted a hearing on Buccino's fee applications. [AA Tab 17]. At that hearing, the court observed that "with the exception of counsel for the debtor, all counsel have apparent conflicts," and given those conflicts, all counsel but counsel for the debtor should be denied fees. [AA Tab 17 at 759–61, 767–68]. The court also criticized the proposed plan as "wholly inadequate" in light of the examiner's report and stated that the plan raised "the question in the mind of the Court whether the debtor's counsel could ever get from the debtor's principals enough information to present a confirmable plan." [AA Tab 17 at 763]. The court further stated that it had no confidence in BPC to "accurately report facts to the Court or reorganize solely with efforts of the debtor." [AA Tab 17 at 759]. Therefore, the court concluded that a trustee should be appointed to manage and preserve the estate. [AA Tab 17 at 768].

Although Leta, on behalf of BPC, opposed the appointment of a trustee,[11] he immediately wrote a letter to the Asst. U.S. Trustee outlining urgent matters and recommending Segal for the position. [RT 5–8 (2/19/93);

---

**10.** Dunlop resigned effective March 16, 1992; Johnson's resignation was accepted by the Board on April 24, 1992; and Wood tendered his resignation on May 8, 1992.

**11.** Leta, on behalf of BPC, appealed the Order appointing the Trustee, but the appeal was later dismissed at the request of BPC.

AA Tab 44]. The bankruptcy court appointed Segal on June 12, 1997. [RT 4 (2/26/93)].

### 6. Post-Trustee Appointment as Special Counsel

On June 23, 1992, Leta delivered a letter to Segal setting forth the current status of the bankruptcy and Leta's recommendations concerning the various projects undertaken. [AA Tab 46; RT 42–43 (2/25/93)]. Based on his assessment that "it would be in the best interest of the estate and its creditors as well as imperative for the Trustee's efficient administration of the estate," Segal filed an application requesting the bankruptcy court to appoint S & W as special counsel to the Trustee, effective June 12, 1992. [Trustee's Supp. Record on Appeal]. The bankruptcy court approved Leta's (S & W's) appointment as special counsel to the Trustee in its Order dated August 3, 1992. [Trustee's Supp. Record on Appeal]. It is undisputed that Leta and S & W performed the transition services for which they were appointed and that the Trustee considered the fees and costs incurred by S & W for its post-trustee services in the amount of $71,765.23 to be reasonable and proper.[12] [AA Tab 48].

### 7. Denial of Compensation

On November 30, 1992, at a hearing scheduled for consideration of S & W's fifth fee application, the bankruptcy court found that Leta had misrepresented facts to the court and served the interests of BPC's principals to the detriment of the estate. [RT 8–18 (11/30/92)]. Based on these conclusions, the bankruptcy court issued its December 1, 1992 Order denying all compensation requested by HJ & L and S & W and ordering the disgorgement of fees and costs already paid the firms from the estate. *Bonneville I,*

---

[12]. This total is derived from post-June 11, 1992 fees and costs requested in S & W's Third (partial) Application for $28,285.63, calculated by adding post-June 11, 1992 fees of $41,843.15 and costs of $1,070.48, and deducting $14,628 for fees and costs incurred in appealing the appointment of the Trustee, Fourth Application ($29,-650.39) and Fifth Application ($13,829.21). [AA Tab 48]. The applications before the bankruptcy court for decision, and this Court on appeal, include fees and costs for services through October 31, 1992.

147 B.R. at 806–07. HJ & L and S & W filed motions seeking an evidentiary hearing on their fee applications. [Appellant's Record on Appeal, Docket Nos. 947, 950–54, 957]. Persuaded that HJ & L and S & W were entitled to a hearing, the court granted their request and in late February through mid-March 1993 presided over hearing ten days of evidence and argument. [Appellant's Record on Appeal, Docket Nos. 958, 981]. After the hearing, the bankruptcy court took reconsideration of the fee applications under advisement. [RT 86–87 (3/10/93)]. On May 22, 1996, the bankruptcy court issued its Memorandum Opinion and Decision affirming the December 1, 1992 order and detailing its findings in support of its denial of all HJ & L's and S & W's requests for fees and costs.

## II.

### A. Bankruptcy Court's Consideration of Post–Hearing Matters

As an initial matter, the Court addresses S & W's objection to the bankruptcy court's reference to facts and events in its May 22, 1996 opinion which occurred after the February/March 1993 evidentiary hearing. S & W argues that the bankruptcy court denied it due process by relying on these post-hearing matters to support its conclusion that Leta acted improperly, without giving notice that it would do so or an opportunity to respond. Specifically, S & W cites the court's reference to criminal indictments of former insiders which occurred in 1995, *Bonneville II,* 196 B.R. at 870 n. 3; the *Interwest* opinion, *id.* at 873; and the 1995 and 1996 settlements obtained by the Trustee with BPC's outside counsel, auditors and insiders, *id.* at 874 n. 11, 875 nn. 12, 13, 884 n. 23.

In Appellant's Supplement of Record on Appeal, S & W asserts that it continued to perform services as special counsel to the Trustee through November 30, 1992. No application for fees and costs attendant to services S & W performed during November, however, was submitted to the bankruptcy court due to the court's decision to deny S & W all fees and costs, which decision was announced at the November 30, 1992 hearing. S & W reserves the right to seek such compensation pending the outcome of this appeal.

The Court finds no due process violation. First, awards of fees pursuant to 11 U.S.C. § 331 are interim and thus subject to final adjustment at the end of the bankruptcy case. *See In re Taxman Clothing Co.,* 49 F.3d 310, 312, 314 (7th Cir.1995) ("[A]ll awards of interim compensation are tentative, hence reviewable—and revisable—at the end of the case."). "Interim awards, too, are refundable to the estate in cases of misconduct." *In re Callister,* 673 F.2d 305, 307 (10th Cir.1982). The contingency of such awards is understandable given that the bankruptcy court must assess whether the professional's services benefited or were reasonably calculated to benefit the estate before addressing the question of the reasonableness of the fees. *See In re Lederman Enters., Inc.,* 997 F.2d 1321, 1323 (10th Cir. 1993). "In some sense, the fees for debtor's counsel in reorganization cases ... are always 'contingent' because they are always subject to being second-guessed by all parties in the case as well as the Court at the conclusion of the case." *In re Amdura Corp.,* 139 B.R. 963, 984–85 (Bankr.D.Colo. 1992); *see also In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 588 (Bankr.D.Utah 1985) ("The Court may review the case at its conclusion and take into account the results obtained in making a final allowance.").

While the Court agrees that S & W was entitled to be heard before the bankruptcy court disallowed its fees, S & W was provided that opportunity during a ten-day evidentiary hearing before the bankruptcy court in February and March 1993. *See In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 847 (3d Cir.1994) ("Unless the applicant is afforded an opportunity to rebut or contest the court's conclusions, the applicant would unfairly and undesirably be deprived of the chance to respond to and assuage the court's questions and concerns."); *In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 70 (2d Cir.1996)

("[D]ue process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions."). The bankruptcy court's findings and conclusions in the December 1, 1992 and May 22, 1996 opinions are based on events which occurred or failed to occur prior to November 30, 1992 when the court issued its first order denying all compensation. However, acknowledging that HJ & L and S & W should be afforded an opportunity to be heard, the bankruptcy court presided over ten days of evidence and argument in February and March 1993 in which S & W had its opportunity to "respond to and assuage the court's questions and concerns." *Busy Beaver,* 19 F.3d at 847. In issuing its order three years later denying the motion to alter or amend, the court did not change its original holding. Rather, the court "fleshed out" that holding with findings of fact adduced from evidence presented at the February/March 1993 hearing. Although the Court is certainly sensitive to the effect of subsequent events in sharpening hindsight, the bankruptcy court's references to post-hearing events are no more than dicta. Further, even if the bankruptcy court had relied on some of these events in making its findings, the Court does not see any substantive missed opportunity to be heard.

The focus of this Court's review is the bankruptcy court's findings of fact and conclusions of law specifically set forth in the May 22, 1996 Opinion which reaffirm and detail the bankruptcy court's holding in its December 1, 1992 Opinion. In those findings, the bankruptcy court mentions two post-hearing matters (for some reason, S & W has not objected to these statements in the Opinion): the Trustee's settlements with BPC insiders "to date" total more than $6 million; and "during this time period, the trustee has recovered more than $1.5 million from the very individuals who would have controlled the litigation under the terms of the proposed plan."[13] *Bonneville II,* 196 B.R. at 888. Although each of these state-

13. Although S & W does not dispute the amount of settlement with insiders "to date," it does dispute the validity of the bankruptcy court's latter observation in that Wood, Johnson and Dunlop would not have controlled litigation as they had already resigned. S & W asserts no culpable insiders would have been left in control of litigation under the plan. The Trustee disputes this assertion by pointing out that Mayer, Brown and Parsons, Behle would have remained as advisors under the plan and they were insider-professionals from whom the estate has recovered sums in settlement.

ments follows one of the bankruptcy court's actual findings, both statements are dicta and not relevant to this Court's review.

## B. Standard of Review

The Court reviews the bankruptcy court's denial of compensation for abuse of discretion. *Interwest*, 23 F.3d at 315. The issue on appeal is whether the bankruptcy court abused its discretion in denying S & W all compensation for its services and expenses. *See In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 846 (10th Cir. BAP 1997). In making this determination, the Court reviews the bankruptcy court's legal determinations de novo and the underlying factual findings under the clearly erroneous standard. *See In re Peterson Distributing, Inc.*, 82 F.3d 956, 958 (10th Cir.1996); *In re Robinson*, 987 F.2d 665, 667 (10th Cir.1993) (per curiam); Fed. R. Bankr.P. 8013. A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, the Court is left with the definite and firm conviction that a mistake has been made. *See Peterson Distributing*, 82 F.3d at 958 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *Robinson*, 987

F.2d at 667–68. Mixed questions of fact and law (also known as "ultimate facts") are reviewed de novo if they involve primarily a consideration of legal principles and under a clearly erroneous standard if the question is primarily a factual inquiry. *See In re Wes Dor, Inc.*, 996 F.2d 237, 241 (10th Cir.1993) (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir.), *cert. denied*, 502 U.S. 983, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991)).

## C. Bankruptcy Court's Findings

In its December 2, 1992 and May 22, 1996 Orders, the bankruptcy court concluded that Leta, while counsel for the debtor-in-possession, breached his fiduciary duty to the estate in "represent[ing] the interests of the principals of the debtor to the detriment of the estate," and engaging in activities designed to "sabotage efforts to ascertain the truth concerning the financial picture of this debtor"; and that such breach warranted the denial of all compensation to S & W for its services. *Bonneville I*, 147 B.R. at 805, 806; *Bonneville II*, 196 B.R. at 888. In support of its holding, the bankruptcy court made the following specific factual findings: [14] (1) Leta failed to disclose the potential liability of

---

**14.** The bankruptcy court stated its findings as follows:

1. Failure to outline, in the disclosure statement, the potential liability to the estate of the insiders of Bonneville for fraudulent transfers, self-dealing, embezzlement and stock fraud. With the settlements produced by the trustee to date, the value to the estate of such actions against the Bonneville insiders totals more than $6,000,000.00.

2. The filing of a plan of reorganization that provided that claims be brought only by the reorganized debtor under the control of an advisory committee controlled by creditor designees. However, a condition precedent to the effectiveness of the plan was the entry of a final order equitably subordinating all claims of Portland General. In essence, this plan would have preserved the Bonneville insiders' control over litigation until the Portland General litigation is finally resolved—potentially, years later. At present, the Portland General litigation has not been resolved, and, during this time period, the trustee has recovered more than $1.5 million from the very individuals who would have controlled the litigation under the terms of the proposed plan.

3. Attempting to utilize the protection of the bankruptcy court for the personal benefit of

Bonneville insiders by seeking a § 105 injunction to enjoin legal actions against such insiders who had little or no involvement with the debtor at the time of the hearing.

4. Filing an amended schedule of assets on April 10, 1992, indicating that the value of Bonneville assets totals $256,887,291.41. The amended schedules overstate the value of Bonneville assets by more than $200 million when compared to the valuation of Bonneville assets reported by Buccino & Associates on January 28, 1992.

5. Drafting and arguing a motion for authority to compromise disputed claims of Magic Valley Limited Partners. Here, David E. Leta failed to disclose two important facts to the court: (1) Some partners of Mayer, Brown & Platt were limited partners of the Magic Valley Partnership. David E. Leta knew prior to the hearing of February 27, 1992, that some Mayer, Brown & Platt partners were financially involved with Magic Valley and that some held limited partnership interests in the project; (2) David E. Leta agreed to and did prepare an opinion letter for the Mayer, Brown & Platt partners who held limited partnership interest in the Magic Valley project. For this work, David E. Leta was paid by his client Mayer, Brown & Platt.

BPC insiders to the estate for fraudulent transfers, self-dealing, embezzlement and stock fraud in the disclosure statement; (2) Leta filed a proposed plan of reorganization which would have required the equitable subordination of Portland General's claims before the plan was effective and therefore would have delayed the implementation of the plan indefinitely; (3) Leta sought a § 105 injunction to enjoin Portland General's suit against BPC insiders, to the exclusive benefit of BPC insiders; (4) Leta filed an amended schedule which overstated the value of BPC assets by approximately $200 million; and (5) Leta failed to disclose the involvement of Mayer, Brown attorneys in the Magic Valley limited partnership and prepared an opinion letter for those Mayer, Brown attorneys involved in the Magic Valley limited partnership.[15] *Bonneville II,* 196 B.R. at 888.

S & W contends that the bankruptcy court abused its discretion in denying S & W's fees because its conclusion that Leta breached his fiduciary duty as general counsel for BPC, the debtor-in-possession, is based on a mistaken view of the role of counsel for debtor-in-possession and a distorted view of the undisputed facts about Leta's conduct. *Appellants' Opening Brief, p. 40.* The Court addresses these objections in turn.

### III.

At the outset, S & W contends the bankruptcy court incorrectly evaluated Leta's conduct based upon a misunderstanding of the role of counsel for a Chapter 11 debtor-in-possession.

> Even though a lawyer represents a bankrupt entity subject to the control of the bankruptcy court, fundamentally, the lawyer is still an advocate for decisions *made by the debtor-in-possession*—the lawyer's *client.* A lawyer must accept decisions made by a debtor-in-possession even if

their utility or prudence is doubtful. *In re Spanjer Bros.,* 191 B.R. 738, 751–52 (Bankr.N.D.Ill.1996). Thus, it is "imperative that debtors' professionals be free to prosecute or defend their clients' position based upon their professional judgment." *In re Rocky Mountain Helicopters,* 186 B.R. 270, 273 (Bankr.D.Utah 1995). Only when debtor's counsel has "material doubts" about whether a course of action proposed by the debtor-in-possession serves the best interest of the estate must the lawyer seek to persuade the client to take a different course of action. *In re Perez,* 30 F.3d 1209, 1219 (9th Cir.1994).

*Appellants' Opening Brief, pp. 40–41.* S & W asserts that the bankruptcy court erred in failing to recognize S & W's fiduciary duty to its client, BPC, as debtor-in-possession, and its role as a zealous advocate of its client's decision-making authority as debtor-in-possession.

The bankruptcy court, on the other hand, referred to Leta's breach of his fiduciary duty to the "estate." What this means is unclear. The bankruptcy court reasoned that BPC, as debtor-in-possession, acts as "trustee" of the bankrupt estate. *Bonneville II,* 196 B.R. at 885–86. As a "trustee," the debtor-in-possession has a fiduciary duty of undivided loyalty and exclusive allegiance to the estate. Thus, as counsel for a corporate debtor-in-possession, counsel "has a duty to look to the interests of the estate and not to the interests of its principals, shareholders, officers or directors." *Id.* at 885.

One reading of the bankruptcy court's view of Leta's fiduciary duty to the "estate" is that it is analogous to counsel's duty to a corporation. In other words, the court found that Leta owed a fiduciary duty to his client, BPC, as debtor-in-possession, and he breached that duty by representing the interests of

---

**15.** The Trustee offers two additional grounds to affirm the bankruptcy court's decision: (1) Leta's failure to disclose or insure that Parsons Behle disclosed in its Rule 2014 application Parsons Behle's receipt of a "preferential transfer" [TA Tab 2 at 5]; and (2) Leta's failure to disclose in his Rule 2016 application that he and his firm would bill BPC semi-monthly and "[a]ll funds will be held in our trust account pending court approval of our fees." [TA Tab 1 at 1]. Although both matters were heard during the evidentiary hearing [RT 78–82, 98–102 (2/17/93)], the bankruptcy court did not rely on either matter in denying all compensation to Leta and his firms. Having affirmed the bankruptcy court's denial of compensation for Leta's and S & W's services while representing BPC as debtor-in-possession on the grounds relied upon by the bankruptcy court, the Court does not address these additional issues.

BPC's decision-making constituents, its officers and directors, rather than the interest of the "estate," a bankruptcy analogue of the corporation. This reading is supported by the court's finding that Leta failed to devote his "full fidelity to the debtor ... based on the statutory requirement that the attorney so engaged be disinterested and free of conflicts required by the fiduciary position occupied by such an attorney in a bankruptcy proceeding." *Id.* at 874 (citing 11 U.S.C. § 327(a)).

> In making such a finding, the Court emphasize[s] its firmly held and continuing belief that on the launching of a case through the deep and hazardous waters of Chapter 11, when experienced counsel is requested to represent a corporation as a debtor in possession, counsel is expected to advise shareholders and insiders that there can be only representation of the corporation itself. Shareholders and insiders must obtain separate representation. No professional is entitled to be paid through a bankruptcy court where there exists an opportunity for divided loyalty. If such manifests itself, the professional will ultimately be a volunteer, for no money will be paid from the estate in such a situation.

*Id.*

Another reading of the court's "fiduciary" language is that Leta, as BPC's counsel, had a fiduciary duty to the "estate" which was derivative of the client's, and since BPC, as debtor-in-possession, stands in the shoes of a trustee, its duties are virtually equivalent to that of a trustee. *See id.* at 885 ("Because of the unique nature of a bankruptcy estate and the concept that the debtor in possession is a fiduciary for that estate, courts have imposed a fiduciary duty upon counsel for a debtor."). In other words, by superimposing the debtor-in-possession's fiduciary duty to the estate on the attorney, the court in effect views the estate as the "ultimate" client. This reading is supported by the bankruptcy court's citation to *In re Sky Valley, Inc.,* 135 B.R. 925,

939 (Bankr.N.D.Ga.1992) for the proposition that "[b]ecause counsel for debtor in possession has [a] fiduciary duty, counsel may be placed in the 'unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client.'" *Bonneville II,* 196 B.R. at 886.

The latter view of counsel for debtor-in-possession as a fiduciary to the estate reflects a fairly recent development in bankruptcy law which is curiously undefined. From a review of the cases, it appears this conclusion is reached either by finding that the client is the estate and not the debtor-in-possession,[16] *see e.g., In re Delta Petroleum (P.R.), Ltd.,* 193 B.R. 99, 111 (D.P.R.1996) (citing Model Rule 1.13(a), court concluded that "attorney's client is the estate, not the trustee"); *In re El San Juan Hotel Corp.,* 149 B.R. 263, 272 (D.P.R.1992) *aff'd.,* 7 F.3d 218 (1st Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 49 (1994) (trustee's attorney as the "estate's attorney also has a fiduciary duty to the shareholders and creditors"), or that counsel is a fiduciary to the estate because the client debtor-in-possession (or trustee) is a fiduciary to the estate. *See, e.g., In re JLM, Inc.,* 210 B.R. 19 (2d Cir. BAP 1997) ("Both management and its counsel have fiduciary duties to an estate in bankruptcy."); *In re Rivers,* 167 B.R. 288, 300 (Bankr.N.D.Ga.1994) ("Because a debtor in possession is empowered to perform the duties of a trustee, a debtor in possession is a fiduciary as is the attorney for the debtor in possession."); *In re Whitney Place Partners,* 147 B.R. 619, 620 (Bankr.N.D.Ga.1992) ("The attorney for the debtor in possession is also a fiduciary to the estate"); *Sky Valley,* 135 B.R. at 939 ("The attorney for the debtor in possession is also a fiduciary to the estate."); *In re Brennan,* 187 B.R. 135, 150 (Bankr.D.N.J.1995) ("It is axiomatic that professionals employed by a trustee or debtor in possession have a fiduciary duty to the estate.... This is especially true for the attorney for the trustee or debt-

---

**16.** In one unique case, the bankruptcy court actually identified the creditors as the "clients." *In re Blue Top Family Restaurant, Inc.,* 110 B.R. 777, 778 (Bankr.W.D.Pa.1990) ("Counsel filing cases in this court on behalf of debtors, in order to obtain the relief and protection accorded by

the Bankruptcy Code, stand in a fiduciary relation to their clients, the prepetition creditors and the postpetition creditors; inflicting further damage on those parties is a violation of that fiduciary duty.").

or in possession."); *In re Prudent Holding Corp.*, 153 B.R. 629, 631 (Bankr.E.D.N.Y. 1993) ("Any counsel retained by the trustee or debtor-in-possession is a fiduciary. He owes the duty of undivided loyalty and exclusive allegiance to the estate in bankruptcy."); *In re United Utensils Corp.*, 141 B.R. 306, 309 (Bankr.W.D.Pa.1992) ("An attorney for the debtor has a fiduciary duty not only to the debtor, but has a fiduciary obligation to act in the best interest of the entire estate, including creditors."); *In re Doors and More Inc.*, 126 B.R. 43, 45 (Bankr.E.D.Mich.1991) ("[T]he attorney for the trustee or debtor in possession is also a fiduciary for the estate."); *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 840 (Bankr.C.D.Cal.1991) ("[T]he attorney for debtor in possession is a fiduciary of the estate."); *In re Consupak, Inc.*, 87 B.R. 529, 549 (Bankr.N.D.Ill.1988) ("[C]ounsel for a trustee is a fiduciary of the estate.").[17]

Because the bankruptcy court characterizes Leta's conduct in terms of a breach of fiduciary duty to the estate, an understanding of the role of counsel for debtor-in-possession is germane to this Court's review. Toward this effort, it is helpful to deconstruct the role of debtor-in-possession's counsel to determine who the client is; to whom the attorney owes a fiduciary duty; and what is the nature of the duty owed. *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943) ("[T]o say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation

from duty?"). Without answers to these questions, counsel for debtor-in-possession remains under the threat of sanction (and potential liability) without knowing what conduct is sanctionable. As the bankruptcy court admonished in this case, "[t]his Court draws a bright line—professionals who violate their fundamental ethical obligations to the estates in their charge do not provide 'valuable services' to those same estates," and thus are not entitled to be paid by the estate. *Bonneville II*, 196 B.R. at 887–88. Unfortunately, courts have not defined, and indeed may not be able to define, these "fundamental ethical obligations to the estate[]" with an equally bright line.

Because the inquiry here concerns BPC, the Court addresses these issues in the context of corporations acting as debtors-in-possession.

## A. Fiduciary duty of counsel for debtor-in-possession

To begin, an attorney owes fiduciary duties of loyalty and care to his/her client. Thus, the initial question to be answered is "who is the client?" For attorneys who are retained to assist in the administration of a fiduciary entity, that question is more than an academic inquiry. It is the beginning and end of a tautology which ultimately determines the nature and scope of the duty owed, and whether the duty has been breached.[18] In discussing inherent conflicts of interest problems for attorneys in estate administration in general, the Comment to Rule 1.7 of the Model Rules of Professional Conduct identifies two possible answers: "In estate admin-

---

**17.** Expressly rejecting the argument that counsel for debtor-in-possession owes a fiduciary duty to the estate is *In re Sidco, Inc.*, 173 B.R. 194 (E.D.Cal.1994):

> The authorities cited by appellant to create a fiduciary duty of counsel to the estate is [sic] very weak. These non-binding cases speak of the attorney's fiduciary duty to the estate in unusual contexts, and not as a general principle. These cases do not overthrow Judge Dorian's basic tenet that attorneys for debtors-in-possession have a fiduciary duty to their client, the debtor-in-possession, not to the creditors and shareholders whose interests may be adverse to the debtor. In fact, 11 U.S.C. § 327 guards against concurrent representation of both the creditor and a debtor-in-possession.

> Furthermore, it is the debtor-in-possession who ultimately manages the creditors' and shareholders' interests, while the attorney only advises the debtor. The debtor-in-possession, not the attorney, acts as the trustee to the estate.

> *Id.* at 196 (citations omitted).

**18.** For insightful discussions of this issue, see Geoffrey C. Hazard, Jr., *Triangular Lawyer Relationships: An Exploratory Analysis*, 1 Geo. J. Legal Ethics 15 (1987); Jeffrey N. Pennell, *Representations Involving Fiduciary Entities: Who is the Client?*, 62 Fordham L.Rev. 1319 (1994); Robert W. Tuttle, *The Fiduciary's Fiduciary: Legal Ethics in Fiduciary Representation*, 1994 U.Ill.L.Rev. 889.

istration, the identity of the client may be unclear under the law of a particular jurisdiction. Under one view, the client is the fiduciary; under another view, the client is the estate or trust, including its beneficiaries." *Model Rules of Professional Conduct Rule 1.7 cmt.* Obviously, pre-bankruptcy, counsel's client is the corporation. But who is the client after commencement of the bankruptcy—the debtor-in-possession or the estate? Is the debtor-in-possession the client entity or is it just the decision-making constituent of the client estate?

### 1. Who is the client?

Although the Bankruptcy Code does not define "estate," Section 541 describes how it is created and of what it consists. The commencement of a case under Chapter 11 creates an "estate"; all of debtor's property becomes property of this "estate," including all legal and equitable interests of the debtor. 11 U.S.C. § 541.

Although earlier cases viewed the "estate" as consisting of property to be safeguarded solely for the interests of creditors, the majority view also recognizes the interests of the debtor's equity owners.[19] *Doors and More,* 126 B.R. at 45 ("In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate."); *In re Grabill Corp.,* 113 B.R. 966, 970 (Bankr.N.D.Ill.1990), *aff'd,* 983 F.2d 773 (7th Cir.1993) ("A Chapter 11 debtor-in-possession administers the assets of the estate and any business conducted therein, as a fiduciary for both the equity interests and creditors"); *In re B & W Tractor Co.,* 38 B.R. 613, 614 (Bankr.E.D.N.C.1984) (debtor-in-possession is acting for benefit of itself, its owners, and its creditors); *In re Curry and Sorensen, Inc.,* 57 B.R. 824 (9th Cir. BAP 1986).

■ This majority view is consistent with the analysis of the United States Supreme Court in *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105

S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985). In *Weintraub,* the Supreme Court held the "trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications." *Id.* at 358, 105 S.Ct. at 1996. In so holding, the Supreme Court reasoned that the privilege transfers from corporate officers and directors to the appointed trustee when the corporation takes on the protections of bankruptcy because the trustee assumes "the role most closely analogous to that of a solvent corporation's management," while the officers and directors are in effect "completely ousted." *Id.* at 352–53, 105 S.Ct. at 1992–93. In rejecting respondents' argument that the privilege should stay with the debtor's directors because the trustee has a fiduciary duty to the creditors, the Supreme Court observed that "the fiduciary duty of the trustee runs to shareholders as well as to creditors" and

> respondents ... ignore that if a debtor remains in possession—that is, if a trustee is not appointed—*the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.* Indeed, the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." Surely, then, the management of a debtor-in-possession would have to exercise control of the corporation's attorney-client privilege consistently with this obligation to treat all parties, not merely the shareholders, fairly.

*Id.* at 355–56, 105 S.Ct. at 1994 (citations omitted and emphasis added). Thus, in light of *Weintraub,* the administration of the "estate" must take into account the interests of the debtor corporation's shareholders as well as the creditors, and other parties in interest.

In sum, the estate is created upon filing the Chapter 11 petition, and the beneficiaries of the estate include equity holders as well as creditors. A collection of property interests,

---

**19.** The beneficiaries of the estate also include other "parties in interest," such as holders of

executory contracts.

however, cannot be the client. Is this estate a legal person in which the debtor's property vests upon filing or is it simply a collection of property interests? The answer to this question provides essential direction to the analysis of whether counsel for debtor-in-possession has a "fiduciary duty to the estate," particularly when the debtor, as here, is a corporation.

Prior to filing Chapter 11, BPC was a corporation comprised of assets and liabilities, owned by shareholders who elected a board of directors who in turn selected officers who hired employees. This artificial legal person, the corporation, was represented and operated by its directors and officers, the "principals" of the corporation. Prior to bankruptcy, these principals owed a fiduciary duty to the corporation and its shareholders, which, among other things, required them to exercise reasonable care in making informed business decisions, and prohibited them from any form of self-dealing, fraud or other illegality. *See e.g.,* Utah Code Ann. § 16–10a–840; *Nicholson v. Evans,* 642 P.2d 727, 730–31 (Utah 1982) ("Directors and officers have a fiduciary duty of loyalty to their corporation and its stockholders.").

■ When BPC filed a bankruptcy petition, it became a debtor corporation. 11 U.S.C. § 101(13). Its property became the property of the "estate." 11 U.S.C. § 541. Because BPC filed a petition under Chapter 11, BPC assumed the role of debtor-in-possession. 11 U.S.C. § 1101(1). BPC functioned as debtor-in-possession through its principals which remained in operating control of the bankrupt entity. These principals continued to act as fiduciaries, but their duties and the obligees to whom they owed these duties changed. Once fiduciaries to the corporation and its shareholders, the principals became fiduciaries to the "estate" and its beneficiaries, BPC's shareholders, creditors and other parties in interest. *See Weintraub,* 471 U.S. at 355–56, 105 S.Ct. at 1994–95; *In re Williams,* 152 B.R. 123, 127 (Bankr.N.D.Tex.1992) ("[a]lthough prior to a bankruptcy filing management's fiduciary

duty went to the corporation's shareholders, with a debtor in possession that fiduciary duty changes by running to the creditors as well as the shareholders"); *In re Baldwin–United Corp.,* 43 B.R. 443, 459 n. 22 (S.D.Ohio 1984) (filing a petition under Chapter 11 changes the nature of the directors' duties "from helmsman to guardian").

Much of the confusion relating to the role of counsel for debtor-in-possession originates in the relationship among BPC as debtor-in-possession, BPC as the debtor corporation, and the estate. There are basically two views of this relationship: the "new person" view and the "property" view.[20] Under the new person view, when BPC filed bankruptcy, the filing created a new legal person in the form of the "estate"; BPC's property became the property of the "estate"; and BPC, the debtor-in-possession, became the representative of the "estate." In other words, the created "estate" not only encompasses the property interests of the former debtor but is the legal person in which those property interests vest. The debtor-in-possession is itself not a new entity, but rather acts on behalf the new entity "estate." Under the property view, the property of BPC remains vested in BPC the debtor corporation when it files bankruptcy and BPC assumes new rights, duties and responsibilities as debtor-in-possession. The "estate" created by commencing bankruptcy is not a separate legal person but a collection of property interests which remains vested in BPC. The debtor-in-possession is not a new entity but the debtor with additional rights, duties and responsibilities under the Bankruptcy Code. *See* Fed.R.Bankr.P. 9001(5)(A) ("[I]f the debtor is a corporation, 'debtor' includes ... any or all of its officers, members of its board of directors or trustees or of a similar controlling body.").

The new person view would provide the missing foundation for counsel's fiduciary duty to the estate. If the estate were a legal person, the estate could be a client. Further, because the debtor-in-possession is merely a representative of the estate, it could

---

**20.** For an excellent, in-depth analysis of the new person and property views of the estate, see Stephen McJohn, *Person or Property? On the*

*Legal Nature of the Bankruptcy Estate,* 10 Bankr. Dev. J. 465 (1994).

not be the client, and the fiduciary duties of its officers and directors, as well as those of counsel, would run to the estate.[21]

The new person view, however, lacks support in the law. It suffers flaws similar to those of the "debtor-in-possession as new entity" theory which was rejected by the United States Supreme Court decision in *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco*, a general partnership which was a party to a collective bargaining agreement filed a Chapter 11 petition and continued to operate the business as debtor-in-possession. After filing, the debtor-in-possession rejected the collective bargaining agreement with the approval of the court. The National Labor Relations Board found that the partnership had violated the National Labor Relations Act by refusing to honor the collective bargaining agreement. The Third Circuit denied enforcement of the NLRB order, concluding that the debtor-in-possession was a "new entity" that superseded the debtor and therefore was not bound by the collective bargaining agreement. Although the Supreme Court affirmed, it expressly rejected the new entity theory relied upon by the circuit court:

> Much effort has been expended by the parties on the question of whether the debtor is more properly characterized as an "alter ego" or a "successor employer" of the prebankruptcy debtor, as those terms have been used in our labor decisions. We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obviously if the latter were a wholly "new entity," it would be unnecessary for the Bankruptcy Court to allow it to reject executory contracts, since

it would not be bound by such contracts in the first place. *For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.*

*Id.* at 528–29, 104 S.Ct. at 1197–98 (citations omitted) (emphasis added).

The only difference between the "debtor-in-possession as new entity" and "new person" theories is the new person theory, in light of *Bildisco*, avoids characterizing the debtor-in-possession as a new entity, separate from the debtor. The only legal person added by the commencement of bankruptcy is the estate.[22] Unless the debtor-in-possession chooses to assume a contract as agent of the estate, the debtor continues as party to the contract. The debtor, however, has no property with which to perform. Thus, the effect of the "new person" theory on executory contracts at least is the same as that under the "debtor-in-possession as new entity" theory. As noted by one commentator,

> Consider an application of *Bildisco's* facts using the new person model. Under this view, the debtor in possession would be able to avoid the *Bildisco* result. The new person approach views the debtor in possession as an agent of the estate. Because the labor agreement would not have been assumed, the estate would not be a party to the agreement; thus the debtor in possession, acting as the estate's representative, would not have any obligations under the contract. This hypothetical parallels

---

**21.** There would still be the problem that disposition of the property of the estate affects the various interest holders differently and thus the attorney would face conflict of interest concerns. See discussion in Part III(A)(2)(c).

**22.** A number of courts in executory contracts cases have puzzled over whether the debtor in possession is a "new entity" as compared to the debtor, in trying to decide whether the debtor in possession is bound by the debtor's contracts prior to assumption. What is important, however, is that the estate clearly is a

new entity. The debtor in possession is the debtor, see Bankruptcy Code § 1101(1), acting in a trust capacity as representative of that estate. The debtor can be displaced at any time by an independent trustee; thus, nothing should turn on whether the debtor and the debtor in possession are the same entity. The important issue is not whether the debtor in possession is bound by the debtor's contracts, but whether the estate is.
Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U.Colo. L.Rev. 845, 855 n. 51 (1988) (citations omitted).

the very argument that the Court rejected.[23]

■ Further, the former Bankruptcy Act, the Bankruptcy Code, and the Internal Revenue Code support the view that the estate is a collection of property interests rather than a legal person. Section 342 of the Bankruptcy Act, the precursor to the Bankruptcy Code, recognized the property as vesting in the debtor, if the debtor remained in possession, although it was subject to the court's control.[24] If a trustee were appointed, the property vested in the trustee.[25] Consistent with its predecessor, the Bankruptcy Code identifies the "estate" created by the commencement of a bankruptcy case as a collection of property interests. 11 U.S.C. § 541. There is no provision recognizing the estate as a legal "person."[26] In addition, like the Bankruptcy Act, the "debtor in possession" is the "debtor" which is still in possession of its property, although it has assumed new rights and duties under the Code.[27] Finally, the Internal Revenue Code does not treat the estate as a separate taxable entity distinct from the prebankruptcy corporation. 26 U.S.C. § 1399. Under tax law, the corporation is the same taxable entity, only now in bankruptcy.[28] *See In re L.J. O'Neill Shoe Co.*, 64 F.3d 1146 (8th Cir.1995).

Thus, to the extent the fiduciary duty decisions cited above implicitly rely on the premise that the estate is a separate legal person in which the property of the debtor vests, the Court concludes that such is not well-founded in the law. Further, as the estate is not a legal person, characterizing the estate as the client serves no meaningful purpose.

■ If the estate is not the client, then the debtor-in-possession is.[29] This is consistent with Sections 327 and 329 of the Bankruptcy Code. It is the debtor-in-possession who employs the attorney.[30] It is the "attorney representing a debtor in a case under this title, or in connection with such a case," who is required to disclose to the court the terms

**23.** McJohn, *supra* note 20, at 489.

**24.** Where no receiver or trustee is appointed, the debtor shall continue in possession of his property and shall have all title and exercise all the powers of a trustee appointed under this Act, subject, however, at all times to the control of the court and to such limitations, restrictions, terms, and conditions as the court may from time to time prescribe.
Bankruptcy Act of 1898, 11 U.S.C. § 342 (repealed 1978).

**25.** The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act, except insofar as it is to property which is held to be exempt, to all the following kinds of property wherever located....
Bankruptcy Act of 1898, 11 U.S.C. § 70 (repealed 1978).

**26.** The definition of "person" under the Bankruptcy Code includes an "individual, partnership, and corporation, ..." but does not include estate. 11 U.S.C. § 101(41).

**27.** Section 1101(1) defines "debtor-in-possession" as the "debtor except when a person that has qualified under section 322 of this title is serving as trustee in the case." Section 101(13) defines "debtor" as a "person ... concerning which a case under this title has been commenced," and the section 101(41) definition includes corporation as a "person."

**28.** Similarly, Section 346(c)(1) of the Bankruptcy Code provides:

> The commencement of a case under this title concerning a corporation or a partnership does not effect a change in the status of such corporation or partnership for the purposes of any State or local law imposing a tax on or measured by income. Except as otherwise provided in this section and in section 728 of this title, any income of the estate in such case may be taxed only as though such case had not been commenced.

11 U.S.C. § 346(c)(1).

**29.** Indeed, the majority of fiduciary duty opinions cited above identify the client as the debtor-in-possession.

**30.** **Employment of professional persons**

> (a) Except as otherwise provided in this section, the trustee [debtor-in-possession], with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee [debtor-in-possession] in carrying out the trustee's [debtor-in-possession's] duties under this title.

11 U.S.C. § 327(a).

of his or her compensation agreement with the debtor-in-possession.[31]

Based on the above, the Court concludes that S & W's client was BPC as debtor-in-possession and not the "estate."

## 2. What obligations does counsel owe?

The decisions imposing a fiduciary duty to the estate and its beneficiaries upon counsel for debtor-in-possession generally do not give content to that duty or offer a normative model which would predict the attorney's conduct and the outcome of judicial decisions. In the few decisions in which some content is provided, there is no consensus about the nature of the fiduciary duty imposed. In other words, stare decisis has failed to provide clear guidance as to the duties of counsel for debtor-in-possession. The cases cover the landscape. Given this confusion, it is helpful first to ascertain what duties counsel for debtor-in-possession owes his/her client and the bankruptcy court, and then determine if the imposition of other duties on counsel, *e.g.* derivative duties, is required to fulfill the purposes of the Bankruptcy Code.

### a. To the client debtor-in-possession

Pursuant to the Model Rules of Professional Conduct ("Model Rules"), counsel owes fiduciary duties of loyalty and care to his/her client, the debtor-in-possession. Counsel's duty of loyalty to the debtor-in-possession includes the duty to maintain client confidentiality and prevent any conflict of interest. *See* Model Rules of Professional Conduct Rules 1.6, 1.7, 1.8, 1.9, 1.10. The duty of care to the client encompasses the attorney's duty to abide by the client's decisions regarding legal objectives of the representation, to act competently and with reasonable diligence, to zealously represent the client, to keep the client reasonably informed as to the representation, and to exercise independent judgment and render candid advice. *See* Model Rules of Professional Conduct Rules 1.1, 1.2, 1.3, 1.4, 2.1.

■ These duties to the client are the same for bankruptcy practitioners as well as nonbankruptcy practitioners. *See In re Roberts,* 46 B.R. 815, 832 (Bankr.D.Utah 1985), *aff'd in part, rev'd in part,* 75 B.R. 402 (D.Utah 1987) (Attorneys practicing before the bankruptcy court are "held to the same ethical standards as are other counsel."); *Consupak,* 87 B.R. at 549–50 (Code of Professional Responsibility and Model Rules provide substantial guidance to courts in evaluating conduct of counsel for the trustee); *Doors and More, supra* (finding restrictions on counsel for debtor-in-possession include (1) no adverse interest and must be disinterested; (2) retention subject to court's approval; and (3) code of professional conduct); *In re Kendavis Industries Int'l, Inc.,* 91 B.R. 742, 753 (Bankr.N.D.Tex.1988) (Counsel "had a conflict of interest in representing the Debtors in these cases, whether under the ABA Code of Professional Responsibility, or under the Bankruptcy Code."). There is no provision in the Bankruptcy Code which excepts an attorney from his/her ethical responsibilities under the Model Rules.

Indeed, the Bankruptcy Code provisions dealing with conflicts of interest are much stricter than their counterparts in the Model Rules. *Compare* 11 U.S.C. §§ 327, 328, 329 *with* Model Rules 1 .5, 1.7, 1.8, 1.9. 1.10; *In re Amdura Corp.,* 121 B.R. 862, 866 (Bankr. D.Colo.1990) (Court recognized the applicability of professional standards, but noted that "activities and multiple representation that may be acceptable in commercial settings, particularly with the informed consent of clients, may not be acceptable in bankruptcy."). The conflict of interest prohibition under the Bankruptcy Code differs from ethical standards in that the Code (1) does not permit waiver or the trustee's consent to the representation of dual interests, 11 U.S.C.

---

**31. Debtor's transactions with attorneys**

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).

§ 327; and (2) specifically prohibits certain "conflicts of interest" in its requirements that counsel for debtor-in-possession be "disinterested"[32] and not hold or represent an "interest adverse to the estate." 11 U.S.C. §§ 327(a), 328(c). Further, counsel's fiduciary duty to the debtor-in-possession requires the "full and fair" disclosure of conflicts of interest.

> "An attorney is not automatically precluded from representing a party merely because he has formerly represented others who are parties to the current transaction. However, an attorney owes a fiduciary duty to the client by whom he is retained to exercise his independent professional judgment on behalf of that client.... This includes the duty to disclose any conflicts of interest that may arise from his representation of other parties. Actually, the duty goes further than simple disclosure. Given that the duty is upon the attorney to 'divulge conflicts, and not upon the client to ferret them out', the attorney should not only inform the parties of the former representations, but should evaluate for himself, as well as for his client, any potential for any impropriety that might arise ... Only such reflection on the part of the attorney could lead to the 'full and fair disclosure' required. Thus, the general rule that a lawyer may represent clients with potentially conflicting interests with the consent of the clients is qualified in that it must be 'obvious' that he can adequately do so."

*Amdura*, 139 B.R. at 978 (quoting *Matter of King Resources Co.*, 20 B.R. 191, 200–01 (D.Colo.1982)). The Code also imposes additional statutory safeguards against counsel breaching his/her duty of loyalty to the client by overreaching. 11 U.S.C. § 329; Fed. R.Bankr.P. 2016.

The only other duty of counsel to his/her client, the debtor-in-possession, spelled out in the Bankruptcy Code is the duty "to represent or assist the [debtor-in-possession] in carrying out the [debtor-in-possession's] duties under this title." 11 U.S.C. § 327(a). Nothing in this language suggests that counsel's representation of the debtor-in-possession differs from the nature and scope of attorney-client representation set forth in the Model Rules, except that counsel's level of competence and knowledge must reflect sufficient expertise in bankruptcy, specifically Chapter 11 proceedings, so that counsel is able to assist his/her client in the performance of its duties under the Code. *See Whitney Place, supra*.

### b. To the bankruptcy court

Counsel, as an officer of the court, also owes a duty of candor to the tribunal. Model Rules of Professional Conduct Rule 3.3. This duty precludes counsel from making false statements of law or fact to the court and offering false evidence, and requires counsel to disclose controlling adverse legal authority not disclosed by opposing counsel, and facts necessary to avoid assisting the client in a criminal or fraudulent act. *Id.*

■ As noted above, counsel for debtor-in-possession also assumes additional disclosure duties statutorily imposed by Sections 327 and 329 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016. Under the Bankruptcy Code, counsel has the duty to disclose any conflict of interest as well as the terms of compensation not only to the client but to the bankruptcy court. These disclo-

---

**32.** A "disinterested person" is defined as a person that—

 (A) is not a creditor, an equity security holder, or an insider;

 (B) is not and was not an investment banker for any outstanding security of the debtor;

 (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

 (D) is not and was not, within two years before the date of the filing of the petition, a director,

officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

 (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason[.]

11 U.S.C. § 101(14).

sure duties are mandated because the court must approve both the employment and compensation of counsel as counsel is compensated from the estate. *See Doors and More,* 126 B.R. at 44–45; *Consupak,* 87 B.R. at 548–49 (Because attorney for trustee is compensated from the estate, attorney performs duties as officer of the court.); *In re Coastal Equities, Inc.,* 39 B.R. 304, 308 (Bankr. S.D.Cal.1984) (same for attorney for debtor-in-possession); *Pension Benefit Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.,* 42 B.R. 960, 963 (E.D.Pa.1984) (same for attorney for creditors' committee).

The procedure for approval of employment of an attorney by the debtor-in-possession relies on counsel's full and honest disclosure of any conflict of interest in the application for an order of employment. To insure such, Bankruptcy Rule 2014(a) requires counsel to disclose in a verified statement the following:

> the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed.R.Bankr.P. 2014(a). The Tenth Circuit has strictly interpreted counsel's duty under Section 327(a) and Rule 2014(a) to mandate disclosure of potential, as well as actual, conflicts of interest. *See Interwest,* 23 F.3d at 317; *see also Smitty's Truck Stop,* 210 B.R. at 849–50; *Amdura,* 139 B.R. at 978. The duty to disclose any conflict continues throughout counsel's representation of the debtor-in-possession. *See* 11 U.S.C. § 328(c); *Smitty's Truck Stop,* 210 B.R. at 849.

■ Similarly, pursuant to Section 329(a) and Bankruptcy Rule 2016(b), counsel has a duty to disclose all fee payments and agreements made after one year before the date of

the filing of bankruptcy "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." 11 U.S.C. § 329(a). Counsel's initial disclosure must be supplemented if the debtor makes any further payment or agrees to further payment to counsel after the initial disclosure. Fed.R.Bankr.P. 2016(b). The purpose of Section 329 and Rule 2016 is to

> enable the Bankruptcy Court to carry out its traditional role of scrutinizing carefully the compensation paid to the debtor's attorney. Courts have long recognized that the debtor is in a vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney. The purpose of this process is to prevent overreaching by an attorney and provide protection for creditors.

*Smitty's Truck Stop,* 210 B.R. at 848. The disclosure requirements of Section 329 are " 'mandatory not permissive.' " *In re Investment Bankers, Inc.,* 4 F.3d 1556, 1565 (10th Cir.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994) (citing *In re Bennett,* 133 B.R. 374, 378 (Bankr. N.D.Tex.1991)).

Finally, counsel for debtor-in-possession has a duty to the court pursuant to Bankruptcy Rule 9011,[33] the counterpart to Fed.R.Civ.P. Rule 11. Pursuant to this duty, counsel must in good faith investigate the validity of his/her client's story of events before initiating litigation or signing any pleading.

> As with Rule 11, the test for imposing Rule 9011 sanctions is whether the individual's conduct was reasonable under the circumstances. In applying this test, the bankruptcy court "is not to use the benefit of hindsight but 'should test the signer's conduct by inquiring what was reasonable to

---

**33.** Bankruptcy Rule 9011 as it existed at the time the bankruptcy court ruled stated in pertinent part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by

> existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.

Fed.R.Bankr.P. 9011(a). Bankruptcy Rule 9011 was amended, effective December 1, 1997.

believe at the time the ... motion ... was submitted.'"

*In re Downs,* 103 F.3d 472, 481–82 (6th Cir. 1996) (citations omitted) (affirming the bankruptcy court's holding that counsel for debtor-in-possession had not violated Rule 9011 in filing a motion to convert Chapter 11 to Chapter 7 because he was retained on short notice and had a limited period of time in which to research the facts of the case).

### c. To the estate beneficiaries?

■ As a general principle, attorneys owe no duty to nonclients. Thus, counsel for the debtor-in-possession would not have any fiduciary duty to the beneficiaries of the estate because they are not clients. Neither is there any provision in the Bankruptcy Code which identifies such a duty. Most of the courts which have found that counsel is a fiduciary of the estate and its beneficiaries seem to base this conclusion on a theory of derivative duty, *i.e.,* because the client debtor-in-possession is a fiduciary to the estate and its beneficiaries, the attorney owes fiduciary duties to the client's obligees—those with interests in the estate. *See, e.g., Brennan,* 187 B.R. at 150 ("[F]iduciary duty of the debtor's professionals is derivative of the debtor's fiduciary duty."). If counsel does owe fiduciary duties to these nonclients, what is the nature and scope of those duties? The pertinent case law either does not address this question or provides inconsistent answers.

Some courts have held that the fiduciary duties of counsel are "equivalent" to those of the debtor-in-possession or trustee. *See Consupak,* 87 B.R. at 548; *In re Imperial "400" Nat'l, Inc.,* 456 F.2d 926, 929 (3d Cir. 1972) ("A trustee in reorganization is an officer of the court who occupies a special fiduciary position, and counsel for the trustee has equivalent fiduciary responsibilities to the estate in reorganization and the creditors."); *Whitney Place,* 147 B.R. at 620–21 ("[T]he

status of the client and the attorney may often overlap in a Chapter 11 case, as the debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided."); *In re Harp,* 166 B.R. 740, 748 (Bankr.N.D.Ala.1993) (same).

These "equivalent" fiduciary duty cases define counsel for debtor-in-possession as a fiduciary to the estate and its beneficiaries through the following analysis. Because Section 1107(a) of the Bankruptcy Code vests the debtor-in-possession with the powers and duties of a trustee, the debtor-in-possession is an officer of the court, as well as a statutory fiduciary of the bankrupt estate.[34] 11 U.S.C. §§ 1106, 1107(a); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 200 n. 3, 103 S.Ct. 2309, 2311 n. 3, 76 L.Ed.2d 515 (1983) (The debtor-in-possession occupies the shoes of a trustee in every major way.); *Interwest,* 23 F.3d at 316 n. 9 ("[A] debtor in possession is a statutory fiduciary of its own estate."); *In re DN Associates,* 3 F.3d 512, 514 (1st Cir.1993) (Debtor-in-possession is fiduciary of bankrupt estate under 11 U.S.C. §§ 323(a), 1107(a).); *In re Intermagnetics America, Inc.,* 926 F.2d 912, 916 (9th Cir. 1991) ("Officers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties."); *Rivers,* 167 B.R. at 300 ("Because a debtor in possession is empowered to perform the duties of a trustee, a debtor in possession is a fiduciary."); *In re Bellevue Place Assoc.,* 171 B.R. 615, 623 (Bankr. N.D.Ill.1994) ("Chief among [the specific duties and obligations imposed upon the debtor-in-possession] is that the debtor-in-possession is a fiduciary to all of its creditors and equity security holders."). Thus, be-

---

34. **Rights, powers and duties of debtor in possession**

 (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all

the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in section 1106(a)(2),(3), and (4) of this title, of a trustee serving in a case under this chapter.
11 U.S.C. § 1107(a).

cause counsel represents the debtor-in-possession who owes fiduciary duties to the estate and its beneficiaries, counsel's duties as attorney for a fiduciary are "equivalent" to those of the debtor-in-possession or trustee. What is uncertain is whether counsel's "equivalent" fiduciary duties include the debtor-in-possession's statutory duties or only common law fiduciary duties of loyalty and care to the estate and its beneficiaries.

Certainly equating the statutory duties of counsel with those of the client, whether debtor-in-possession or trustee, is inconsistent with the Bankruptcy Code. For example, if the bankruptcy court authorizes the trustee to serve as his or her own attorney under Section 327(d), the trustee must distinguish compensation for legal work from work generally performed by the trustee without the assistance of counsel. 11 U.S.C. § 328(b). This statute has been interpreted as requiring the denial of compensation to an attorney appointed to represent the trustee for performing the trustee's statutory duties. *See In re Hunt's Health Care, Inc.,* 161 B.R. 971, 983 (Bankr.N.D.Ind.1993); *In re Butterbaugh,* 135 B.R. 507, 510 (Bankr.N.D.Ohio 1991) ("Allowing the trustee's counsel to be compensated for services which can and should be performed by the trustee not only depletes the estate unnecessarily, but violates the Code itself."); *In re Gary Fairbanks, Inc.,* 111 B.R. 809, 811 (Bankr. N.D.Iowa 1990) ("While trustees generally perform all ministerial and administrative duties of the estate, it is the responsibility of an attorney appointed to represent the estate to exercise professional skills and expertise beyond the ordinary knowledge and skill of the trustee."). The recognized differences between the duties of counsel and the trustee reflect a traditional understanding of the role of counsel.

In general, professional time is limited to those tasks performed while representing the trustee in the prosecution of contested matters and adversary proceedings, attendance at court hearings in the capacity of attorney or other professional when the trustee has an interest, the preparation of professional related applications, and the performance of other specialized services that cannot be performed practically or lawfully by the trustee without engaging the services of a professional.

*In re Holub,* 129 B.R. 293, 296 (Bankr. M.D.Fla.1991). Indeed, if the duties of counsel were equivalent to those of the client, the duplication of services clearly would not be in the best interest of the estate. *See* 11 U.S.C. § 330(a)(4)(A)(i). In spite of this, courts which rely on counsel's derivative duty to the estate undermine distinction between the roles of counsel and the fiduciary client. *See, e.g., Sky Valley,* 135 B.R. at 939 (finding counsel for debtor-in-possession has a duty to "supervise auction process" and "oversee the disposition of assets of the estate to assure that the rights of debtor's creditors are protected"); *but see In re Dieringer,* 132 B.R. 34, 36 (Bankr.N.D.Cal.1991) ("The court sees no justification for making the debtor's counsel a policeman of the debtor's postpetition conduct. Under the Code, that role is left to the creditors' committee, individual creditors, or the U.S. Trustee.").

In addition to the express statutory duties, courts have also imposed upon the debtor-in-possession common law fiduciary duties of care and loyalty, concomitant with the aegis of fiduciary. However, even if the referenced "equivalence" is confined to the fiduciary duties of care and loyalty, ethical problems arise for counsel for the debtor-in-possession due to the inherent conflict of interest of the client debtor-in-possession.

The debtor-in-possession has a fiduciary duty of undivided loyalty and exclusive allegiance to the beneficiaries of the "estate"; *i.e.,* equity holders, secured creditors and unsecured creditors who have conflicting interests. The tension caused by this inherent conflict is intensified by the amount of discretion vested in the debtor-in-possession in guiding the estate through reorganization. The cornerstone of Chapter 11 is the presumption that the debtor-in-possession will be permitted to operate its business after filing, unless there is cause for the appointment of a trustee. 11 U.S.C. §§ 1104, 1108. This assures that principals of the debtor-in-possession will ordinarily exercise considerable control over the business. The primary reasons for leaving pre-existing management

in control in a Chapter 11 reorganization are to preserve the continuity of business expertise and to avoid the substantial cost to the estate of bringing in a neutral third party as trustee.[35] Management is presumed to have the knowledge, experience and expertise to operate the business in the most efficient and economical manner, and thus is given considerable discretion in the operation of its business, generally restricted only by the business judgment rule. *See* 11 U.S.C. §§ 363, 365.

The rights and obligations exercised by management under the Bankruptcy Code can be classified into three categories: (1) administrative functions, including hiring professionals and filing the reports and accountings generally associated with running the business while in Chapter 11;[36] (2) operating functions, which include discretionary business decisions whether to use, sell or lease property of the estate, obtain financing and continue operation;[37] and (3) loss allocation functions, which include rejecting or assuming executory contracts,[38] objecting to claims,[39] avoiding transfers and obligations,[40] and filing a reorganization plan.[41] *See generally* 11 U.S.C. §§ 704, 1106, 1107. The nature of management's operating and loss allocation functions is such that management is

required to differentiate among classes of beneficiaries, and thus make decisions which benefit some claimants over others.[42] Thus, because its fiduciary duty runs to all classes of claimants, management for the debtor-in-possession is placed in a conflict-ridden position.

This inherent conflict can actualize in virtually every aspect of the debtor-in-possession's performance of its statutory duties from the date of filing for a Chapter 11 to the submission of a reorganization plan, as the interests of equity owners, secured creditors and unsecured creditors are seldom aligned. Actions that benefit one group may harm the others. Secured creditors generally prefer conservative decisions in operating the ongoing business and expeditious prosecution of the bankruptcy case, as their interest lies in realizing on collateral as quickly as possible if reorganization is not feasible and on avoiding the loss of value in their collateral and the loss of interest. On the other hand, while enjoying the automatic stay of creditors' claims, equity owners who will be paid last, if at all, may wish to pursue riskier investments and more litigation (which delays the prosecution of the bankruptcy) to increase

---

35. John T. Roache, *The Fiduciary Obligations of a Debtor in Possession*, 1993 U.Ill.L.Rev. 133, 140–41.

36. 11 U.S.C. §§ 327, 1106.

37. 11 U.S.C. §§ 363, 364, 704, 1107, 1108.

38. 11 U.S.C. § 365.

39. 11 U.S.C. § 1106(a)(1), incorporating 11 U.S.C. § 704(5). Section 1106 expressly excludes from the debtor-in-possession's duties the trustee's investigative duties. 11 U.S.C. § 1106(a)(2)(3) and(4). Despite this express statutory exception, some courts have imposed a duty on the debtor-in-possession to investigate and report on the conduct of insiders to uncover and pursue causes of action against them. *See, e.g., Curry and Sorensen,* 57 B.R. at 828 ("While pursuant to Section 1107(a) of the Code, a debtor in possession is not required to investigate and report under Sections 1106(a)(3) and (4), the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession."); *but see Brennan,* 187 B.R. at 150 (Since "the fiduciary duty of the debtor's professionals is derivative of the debtor's fiduciary duty," and "a

debtor in possession has no duty to investigate his own financial affairs, it follows that his professionals have no such duty either."). However, the Code provides that committees of creditors may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c)(2); *In re Cumberland Farms, Inc.,* 154 B.R. 9, 12 (Bankr. D.Mass.1993) (three basic functions of creditors' committee are to monitor debtor's operations, investigate for potential insider causes of action where facts warrant it, and negotiate the plan).

40. 11 U.S.C. §§ 544–554.

41. 11 U.S.C. §§ 1106(a)(5), 1121(a)(b) and (d).

42. For a thoughtful analysis of the inherent conflicts for debtors-in-possession in business governance and control in a Chapter 11 reorganization case, see Raymond T. Nimmer & Richard B. Feinberg, *Chapter 11 Business Governance: Fiduciary Duties, Business Judgment, Trustees and Exclusivity,* 6 Bankr.Dev.J. 1 (1989).

the amount of their return.[43] Also, impaired creditors will likely oppose a reorganization plan which permits shareholders to retain an equity interest in the reorganized corporation. *See, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990). In short, "reorganization involves the 'turbulent rivalry' of many interests." *In re Curlew Valley Assoc.,* 14 B.R. 506, 511 (Bankr.D.Utah 1981). How to reorganize in the best interest of such an "estate" is no easy matter for the debtor-in-possession.

Owing a fiduciary duty to an estate comprised of conflicting interests can also be quite problematic for the principals who act for the debtor-in-possession. "Although, in the ideal situation, matters which best serve the interests of a reorganizing debtor's principals will also best serve the interest of the estate and the creditors, such is not necessarily and inevitably the case." *In re Office Products of America, Inc.,* 136 B.R. 983, 987 (Bankr.W.D.Tex.1992). Not only do the principals have to make sure their own self-interest in continuing as directors and officers of the post-bankruptcy, reorganized corporation does not improperly influence their conduct during the reorganization, they must insure their conduct promotes the best interests of all parties who own an interest in the estate, both creditors and shareholders alike. *See Harp,* 166 B.R. at 747 ("It is not easy for a debtor-in-possession, corporate or individual, to serve two masters—juggling the personal needs and desires of the debtor itself, with its clear fiduciary responsibilities to unsecured creditors, other parties in interest and the court.").

While Chapter 11 clearly countenances this conflict by creating the debtor-in-possession, the Model Rules of Professional Conduct prohibit attorneys from representing such conflicting interests. *See Amdura,* 121 B.R. at 865. Imposing upon counsel for debtor-in-possession the client's fiduciary duty to the estate beneficiaries in effect transforms these nonclients into clients. An attorney may represent multiple beneficiaries only if their

interests are not adverse. Model Rule 1.7(b). The interests of estate beneficiaries are inherently adverse. Nor can the attorney act as an intermediary for these interests under Model Rule 2.2. The role of intermediary requires that common representation advance the "mutual interest" of the beneficiaries; the various creditor and shareholder groups do not share a "mutual interest." Needless to say, the attorney cannot fulfill his/her duties of loyalty to and zealous representation of these conflicting interests. Model Rules 1 .4 and 1.6. Thus, imposing the client's fiduciary duties on counsel directly conflicts with counsel's ethical responsibilities to the client.

Underscoring this conflict with counsel's ethical duties to the client is the formal opinion issued by the American Bar Association Committee on Ethics and Professional Responsibility on "Counseling a Fiduciary" which views the attorney's duty as running only to the fiduciary client and not the fiduciary's beneficiaries.[44]

> A lawyer who represents the fiduciary in a trust or estate matter is subject to the same limitations imposed by the Model Rules of Professional Conduct as are all other lawyers. The fact that the fiduciary has obligations to the beneficiaries of the trust or estate does not in itself either expand or limit the lawyer's obligations to the fiduciary client under the Model Rules, nor impose on the lawyer obligations toward the beneficiaries that the lawyer would not have toward other third parties.

ABA Comm. on Ethics and Professional Responsibility, Formal Op. 380 (1994)("ABA Opinion"). The ABA Opinion emphasizes that

> [t]he Model Rules provide important guidelines for defining a lawyer's duties to a client. These guidelines contain no exceptions when the client owes duties, fiduciary or otherwise, to third parties. So long as a fiduciary is the lawyer's only client in the matter, that client is entitled

---

43. *See* Roache, *supra* note 35.

44. The ABA Opinion views the beneficiaries as third party nonclients who are outside the protective sphere of the attorney-client relationship, except that the attorney cannot participate in a crime or fraud against the beneficiaries.

to the same protections under the Model Rules as any nonfiduciary client, including, most importantly, the duty of confidentiality set forth in Model Rule 1.6.

As noted above, there is no provision in the Bankruptcy Code which imposes on counsel for debtor-in-possession fiduciary duties to creditors and shareholders. Without express statutory exception from the ethical rules governing the attorney-client relationship, courts should be hesitant to read in fiduciary duties for counsel for debtor-in-possession which violate those ethical rules.

Of equal concern to counsel for debtor-in-possession under an equivalent or derivative duty theory is counsel's potential liability to estate beneficiaries. If counsel owes the same fiduciary duty to creditors and shareholders and other parties in interest as does the debtor-in-possession, any breach of debtor's duties theoretically exposes counsel to liability to these nonclient beneficiaries, even if counsel's conduct was not fraudulent or criminal. *But see Dieringer*, 132 B.R. at 37 (rejecting creditors' claim against debtor-in-possession's counsel for mismanagement, "except to the extent that his conduct was fraudulent or otherwise intentionally wrongful").

## B. Protecting the interests of the estate under the Bankruptcy Code

Imposing an undefined fiduciary duty to the estate and its beneficiaries on counsel for debtor-in-possession is confusing, unhelpful and unnecessary to insure that counsel is independent and aware of his/her duty under the Bankruptcy Code and Model Rules to represent and assist the debtor-in-possession in the performance of its duties. In virtually all the cases which rely on counsel's fiduciary duty to the estate in sanctioning counsel, the same result would be reached by finding a breach of counsel's fiduciary duty to the client debtor-in-possession, violations of Sections 327, 328, or 329, and/or failure to provide services which benefit the estate under Section 330.

An example is the recent Tenth Circuit bankruptcy appellate panel decision in *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844 (10th Cir. BAP 1997). The panel noted that "[b]ecause of the unique nature of the bankruptcy estate, the debtor in possession is considered a fiduciary of that estate," [45] and "[f]or the same reason, courts have imposed a fiduciary duty upon counsel for the debtor in possession." *Id.* at 850. In support of the latter proposition, the panel cited the bankruptcy court's May 1996 opinion in this case. *Bonneville II*, 196 B.R. at 885. The panel, however, identified counsel's fiduciary duty as requiring "the attorney to exercise independent professional judgment on behalf of the estate," which includes the "duty to disclose any actual or potential conflicts of interest with the estate." *Smitty's Truck Stop*, 210 B.R. at 850. The panel concluded that the attorney failed to "comply with the disclosure requirements of §§ 327 and 329 and Rules 2014(a) and 2016(b)," and thus affirmed the bankruptcy court's order for disgorgement of the attorneys' retainer. *Id.* at 851.

*Smitty's Truck Stop* is indicative of much of the confusion caused by the evolving law of counsel's fiduciary duty to the estate. Although seemingly recognizing that "courts have imposed a fiduciary duty on counsel for the debtor in possession" which runs to the "estate," the panel identified two sources of counsel's duty: the duty to exercise independent professional judgment, which is an ethical duty all attorneys owe their clients, *see Model Rules of Professional Conduct Rule 2.1*; and counsel's statutory duties under Sections 327 and 329 (and their attendant Bankruptcy Rules) which run to the client debtor-in-possession and the bankruptcy court. Given that the panel sanctioned counsel for violating Sections 327 and 329 of the Bankruptcy Code, there is no reason to engraft on counsel's duty to its client, the debtor-in-possession, the fiduciary duty of the debtor-in-possession to the estate and its beneficiaries, if that is what the panel intended. *Doors and More, supra* (although finding that counsel for debtor-in-possession

**45.** *Id.* at 850 (citing *In re Interwest Business Equipment, Inc.*, 23 F.3d 311, 317 (10th Cir. 1994)).

owes fiduciary duty to estate, the court denied counsel's application for employment based on violation of his professional responsibility under Model Rule 1.1 to competently represent his client in bankruptcy).

Similarly, in *In re Whitney Place Partners*, 147 B.R. 619 (Bankr.N.D.Ga.1992), a case often cited for the proposition that the roles of counsel and debtor-in-possession overlap in the performance of their fiduciary duties to the estate and its beneficiaries, the bankruptcy court did not find that counsel for the debtor-in-possession breached his fiduciary duty, although the debtor-in-possession partnership was sanctioned for its bad faith filing of a Chapter 11 petition that lacked reasonable prospects of reorganization. Although the court remarked that "[d]ebtor's attorney's duty as fiduciary of the estate requires an active concern for the interests of the estate and its beneficiaries," *id.* at 621, the court evaluated counsel's conduct under Bankruptcy Rule 9011 and concluded that counsel's neglect "appears to have arisen from a lack of experience and understanding of Chapter 11 practice rather than from intentional bad faith." *Id.* at 622.

Also, in *In re Consupak, Inc.*, 87 B.R. 529 (Bankr.N.D.Ill.1988), the case cited for the "equivalent" duties to the estate and its beneficiaries of counsel and the trustee or debtor-in-possession, the bankruptcy court found that the trustee and his counsel breached their fiduciary duties to the estate when the trustee failed to invest estate funds in an interest-bearing account and his counsel failed to advise the trustee of his obligation to do so. As a result, the court surcharged the trustee one-third of the amount of lost interest by deducting it from his fees and reduced the amount of fees requested by the attorney for the trustee.

In the court's discussion of the fiduciary duties of counsel for the trustee, the court explained how these duties were "equivalent" to those of the trustee.

> All parties seeking compensation from a bankruptcy estate may be held to fiduciary standards. Those performing duties in the administration of a bankrupt estate are not acting as private individuals, but as officers of the court. As such, they are expected to render loyal and disinterested service in the interest of those for whom they purport to act.
>
> Among the fiduciaries of a bankruptcy estate are the various attorneys who may be compensated from the estate. Similarly, the fiduciary duties of counsel for a bankruptcy trustee have been held to be "equivalent" to those of the trustee.

*Id.* at 548 (citations omitted). However, after characterizing the fiduciary duties as equivalent, the *Consupak* court explained that the functions of the trustee and his attorney were different.

> This does not mean that counsel for a trustee is to undertake the administrative responsibilities of the trustee. An attorney may only be compensated as an attorney for services requiring legal expertise. Where counsel does not so limit his services, this Court would accordingly deny him professional compensation. Thus, while both a trustee and his attorney are fiduciaries, they do not perform the same functions in a bankruptcy case.

In this case, Trustee's Attorney stresses the distinction between the functions of a bankruptcy trustee and his attorney. He correctly asserts that a trustee has primary responsibility for administering the estate and may seek legal advice when necessary. On the other hand, Trustee's Attorney would limit his own role to rendering legal advice upon request. Under this interpretation of duty, unless a trustee takes the initiative to seek his attorney's advice, the attorney would have no duty to counsel the trustee. As applied to his own case, Trustee's Attorney argues that he had no duty to render unsolicited advice regarding the investment of funds.

Trustee's Attorney misstates his duty. Besides serving as agent of a bankruptcy trustee, counsel for a trustee is a fiduciary of the estate. As a result, the attorney's contractual obligation to respond to requests from his client for legal advice is only part of his broader fiduciary duty to the estate. The fact that counsel fulfilled the obligation to advise his client upon

request does not establish satisfactory performance of his overall fiduciary duty.

. . . . .

In evaluating the performance of a trustee's attorney, then, it is necessary to determine the extent of duty to advise a trustee. The lower bounds of that duty are obvious: any attorney must, at a minimum, respond to client requests for legal advice. Because a trustee's attorney also has duties to the estate and to the court, however, the duty to advise requires a more active concern for the interests of the estate and of its beneficiaries, the unsecured creditors.

A trustee's attorney cannot close his eyes to matters having legal consequences for the estate. Especially where legally adverse facts come to his attention, the attorney for a trustee must take the initiative to inform his client of the need for preventative or corrective action. . . .

*The principles underlying this conclusion are not set forth in bankruptcy statutes or rules. Rather, they are derived from ethical norms governing the practice of law. In particular, the Court looks to the American Bar Association Model Code of Professional Responsibility (the "ABA Code") and the American Bar Association Model Rules of Professional Conduct (the "Model Rules").*

*Id.* at 548–49 (citations omitted) (emphasis added).

The court then reviewed an attorney's ethical duties under the ABA Code and Model Rules, specifically Canon 7 of the ABA Code which states "[a] lawyer should represent a client zealously within the bounds of the law" and Model Rules 1.4 Communication, and 2.1 Advisor, and comment to Model Rule 2.1 which states:

"In general, a lawyer is not expected to give advice until asked by the client. However, when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to a client, duty to a client under Rule 1.4 may require that the lawyer act if the client's course of action is related to the representation. A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest."

*Id.* at 551 (quoting Model Rules of Professional Conduct Rule 2.1, comment 5 (1983)). Based on these ethical rules, the bankruptcy court concluded

that an attorney should, on his own initiative, offer legal advice in two circumstances: (1) when the client is unaware of the potentially adverse legal consequences of a proposed course of action, and (2) where the offering of advice would be in the client's best interests. In so doing, the attorney would further Canon 7's objective of zealous client representation. Nowhere in the above-cited standards is there any suggestion that a responsible attorney is a passive observer who can remain silent in the face of a client's legally unacceptable decisions.

These principles are applicable here because Trustee's Attorney was aware that the Trustee had removed funds from interest after September 29, 1986.[46] Both reasons for offering advice were present. First, the Trustee was allegedly unaware of his duty to invest and the potentially adverse legal consequences of disinvestment. Second, it was certainly in the estate's best interests to maximize the estate through investment. Thus, because Trustee's Attorney knew of the Trustee's disinvestment after the Final Report was filed, he was under an ethical obligation to advise his client of the duty to re-invest or at least seek Court direction. And he certainly was under an obligation to know of

---

**46.** In determining counsel's duty to advise, the *Consupak* court distinguished between when the attorney knew of the disinvestment and when he did not:

Trustee's Attorney states that he knew funds had been invested before the filing of the Final Report. There is no evidence that he was aware that a substantial portion of the estate's funds remained uninvested during that period. Given the lack of a general duty to initiate legal advice, as well as the fact that a trustee's attorney is not to perform administrative tasks, the breach of the Trustee's Attorney's duty to advise his client took place after, rather than before, the filing of the Final Report.

*Id.* at 551 n. 19.

the Local Rule that he now disclaims awareness of.

*Id.* at 551.

This case has been cited for the proposition that counsel for debtor-in-possession owes fiduciary duties to the estate which are derivative of the client's and therefore must have an "active concern for the interests of the estate and of its beneficiaries, the unsecured creditors." *See, e.g., Sky Valley,* 135 B.R. at 939. However, a close reading of the case establishes that the court's finding of counsel's breach of fiduciary duty was to the client, in failing his ethical responsibility to advise his client, and not a breach of fiduciary duty to the estate and its beneficiaries.

The distinction between the roles of counsel and debtor-in-possession was implicitly recognized in *In re Interwest Business Equipment, Inc.,* 23 F.3d 311 (10th Cir.1994), in which the Tenth Circuit affirmed the bankruptcy court's disqualification of a law firm from representing three interrelated Chapter 11 debtors-in-possession.[47] In so doing, the circuit court distinguished between the fiduciary duty of the debtor-in-possession and the "professional's obligation to independently serve" the debtor-in-possession. *Id.* at 317.

> In these Chapter 11 cases, the debtors in possession act as "trustees" of the estates in bankruptcy and accordingly they may hire professionals, with court approval, pursuant to § 327. See 11 U.S.C.A. § 1107. Thus, a debtor in possession is a statutory fiduciary of its own estate. 11 U.S.C.A. §§ 1106, 1107(a). A trustee representing an estate in bankruptcy must receive independent counsel, regardless of the estate's relationship to other entities prior to filing. The inability to fulfill the role of independent professional on behalf of the fiduciary of the estate constitutes an impermissible conflict.

*Id.* at 316 n. 9 (case citations omitted). The circuit court then held that counsel's joint representation of these three debtors-in-possession constituted an actual conflict of interest prohibited by Section 327 of the Bankruptcy Code, although the court refused to find that "representation of related estates in bankruptcy is per se prohibited." *Id.* at 318–19. Rather than confusing the fiduciary duty of the debtor-in-possession with the duties of its counsel, the court looked to the "statutory scheme" which gives "the bankruptcy judge discretion and power to ensure professionals are disinterested and do not represent interests adverse to the estate" citing Sections 327, 328 and 329. *Id.* at 317–19.

The concerns that counsel for debtor-in-possession exercise independent judgment in advising the client of its fiduciary duties to the estate and not favor the interests of management to the exclusion of creditors are well-guarded under the attorney's ethical responsibilities to the client, the additional disclosure requirements under Sections 327, 328 and 329 of the Bankruptcy Code, and the court's ultimate finding that counsel is entitled to fees only for services which "benefit the estate" under Section 330.

Additionally, the Bankruptcy Code provides further protection in the rights and powers vested in creditors and other parties in interest. Chapter 11 permits the U.S. Trustee to appoint committees of unsecured creditors, stockholders, debenture holders and other interested parties to monitor the debtor-in-possession's business operations and to investigate potential insider abuse. 11 U.S.C. § 1102(a); *see, e.g., In re Beker Industries Corp.,* 55 B.R. 945 (Bankr. S.D.N.Y.1985) (ordering appointment of official committees for shareholders and debenture holders due to complexity of case). These committees and all parties in interest "may raise and may appear and be heard on any issue in a case" in Chapter 11. 11 U.S.C. § 1109(b). Should any of these parties in interest have concerns that principals of the debtor-in-possession are making decisions based on self-interest, the party or committee may move (1) for the appointment

---

**47.** BPC originally was a party in the *Interwest* consolidated appeal which included BPC's appeal of the bankruptcy court's denial of Mayer–Brown's application for employment as general counsel for BPC and its affiliates. However, by the time the Tenth Circuit heard the case, a trustee had been appointed and had dismissed the appeal.

of a trustee;[48] (2) for the appointment of an examiner to monitor the debtor-in-possession;[49] (3) to convert the case to Chapter 7;[50] or (4) for the discontinuance of business operations.[51] *Curry and Sorensen*, 57 B.R. at 828 ("If a creditor is dissatisfied with lack of action on the part of the debtor-in-possession, the creditor may move to replace the debtor-in-possession with a Chapter 11 trustee; or to convert the Chapter 11 case to one under Chapter 7; move to dismiss the Chapter 11 case; or petition the court to compel the debtor-in-possession to' act or to gain court permission to institute the action itself.")

### 1. Benefit to the estate

The "fiduciary duty to the estate" language interspersed throughout the above-cited opinions is no doubt intended to impress on counsel for debtor-in-possession his/her obligation to assist the debtor-in-possession in carrying out its responsibility to act in the best interest of the estate. However, the confusion wrought by this undefined duty and its intended obligee outweighs its utility. The strict prohibition of conflict of interest and overreaching by counsel and the disclosure requirements under the Bankruptcy Code layered over counsel's ethical responsibilities to the fiduciary client debtor-in-possession generally mandate this result. The ultimate assurance, though, lies in the bankruptcy court's assessment of counsel's compensation under 11 U.S.C. § 330(a).

As amended, Section 330(a) states in pertinent part:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

\* \* \* \* \* \*

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a).[52]

The legislative purpose of the original Section 330 was to "guard against a recurrence of the 'sordid chapters' in the history of fees in corporate reorganizations." S.Rep. No. 989, 96th Cong., 2d Sess. 40, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5826 (quoting *Dickinson Industrial Site, Inc. v. Cowan*, 309 U.S. 382, 388, 60 S.Ct. 595, 599, 84 L.Ed. 819 (1940)). The legislative history includes comments about insider abuse of corporate reorganization which the statute was intended to address:

"The record of corporate reorganizations . . . is not pleasant. It shows the absolute control exercised over reorganizations by the inside few; it shows the financial well-being of investors and the public sacrificed to the insiders' desire for protection and for profit . . . It shows that these delays, these futile prolongations of the agony of reorganization were frequently due to deliberate sabotage by a group which had

---

**48.** 11 U.S.C. § 1104(a).

**49.** 11 U.S.C. § 1104(b).

**50.** 11 U.S.C. § 1112(b).

**51.** 11 U.S.C. § 1108.

**52.** Section 330 was amended in 1994. At the time of the bankruptcy court's first decision denying all compensation to S & W, section 330

allowed "reasonable compensation for actual, necessary services" but made no mention of services which were of benefit to the estate. However, prior to the amendment, courts interpreted "necessary" services as those which "benefited the bankruptcy estate." *See, e.g., Lederman Enters.*, 997 F.2d at 1323.

something to gain and was unwilling to compromise ... The record also shows, with overwhelming proof, that plans of reorganization were frequently dictated by a single interest—by a closely knit inside group; primarily in the interests of that group and of dubious wisdom so far as interest outside the inner circle were concerned." H.R.Rep. No. 1409, 75th Cong., 1st Sess., at 38 (1937)(statement of Justice William O. Douglas).

*In re Kendavis Industries Int'l, Inc.*, 91 B.R. 742, 747 n. 1 (Bankr.N.D.Tex.1988).

Thus, of relevance to the issue here, counsel who "represents" the interests of insiders or principals of the debtor-in-possession to the exclusion of other constituents, generally creditors, not only breaches his/her fiduciary duty to the client debtor-in-possession but does not perform services which are "reasonably likely to benefit the debtor's estate," and therefore is not entitled to compensation for those services.

In *In re Spanjer Brothers, Inc.*, 191 B.R. 738 (Bankr.N.D.Ill.1996), the court's analysis of a charge by the creditors' committee that counsel for debtor-in-possession represented the interests of management to the exclusion of creditors by opposing the appointment of a trustee is instructive here. The *Spanjer* court rejected the committee's motion for denial of all compensation and disgorgement of fees paid counsel for debtor-in-possession, finding the evidence adduced at trial did not support the committee's charge but rather established that counsel for debtor-in-possession "only represented the Spanjer estate per the directions of its management." *Id.* at 751. Although the court refers to the attorney's representation of the "estate," it is clear the court viewed the "estate" in this context as the corporate entity in bankruptcy, and the attorney's fiduciary duty to the debtor-in-possession.

> While it is true that "[c]ounsel for a Chapter 11 debtor owes a fiduciary duty to the corporation ... as an entity and represents its interests, not those of its principals," the mere fact that an attorney for a debtor opposes and loses a motion for the appointment of a trustee under

§ 1104(a)(2) does not ipso facto demonstrate that the attorney is representing the interests of the debtor's principals and management to the exclusion of the creditors, and thus breaches a fiduciary duty owed to the debtor. The Court rejects the Committee's inference that any time counsel for a Chapter 11 debtor opposes the appointment of a trustee, same is being done for self-serving or improper purposes. After all, an attorney is obliged to follow the directions of his client....

Pertinent to this claimed conflict issue, common to both fee applications, is Rule 1.13(a) of the Rules of Professional Conduct for the Northern District of Illinois, which provides that when a lawyer is employed by an organization, he represents the organization which acts through its duly authorized constituents. The Comments to this Rule state:

> When constituents of the organization make decisions for it, the decisions ordinarily must be accepted by the lawyer even if their utility or prudence is doubtful. Decisions concerning policy and operations, including ones entailing serious risk, are not as such in the lawyer's province. However, different considerations arise when the lawyer knows that the organization may be substantially injured by action of a constituent that is in violation of law.

> It was not a violation of law for the Debtors' management to oppose the appointment of a Chapter 11 trustee.... Therefore, neither [attorney] breached his fiduciary duty by opposing the appointment of a trustee.

*Id.* at 751–52. The court also rejected the committee's motion to deny *all* fees to counsel for debtor-in-possession for opposing the appointment of a trustee. Noting that counsel was directed by management for the debtor-in-possession to oppose the appointment, the court observed that "[d]enial of all compensation for [the attorney's] labors would effectively penalize him for following the directions of the Debtors' officers to retain their control position rather than be ousted by a Chapter 11 trustee," and thus

the court reduced rather than deny the requested fees.

Section 330 does not authorize compensation only to professionals who take successful actions. To the contrary, if there was a reasonable chance of success which outweighed the cost in pursuing the action, then fees relating thereto are compensable. Hindsight is always 20/20, but no one could prejudge whether or not the Court would either grant the Committee's motion or sustain the Debtors' objections until after all the evidence was admitted. The Court does not expect an attorney for a debtor to succeed in every endeavor he undertakes on behalf of the debtor.... But, the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate.

*Id.* at 757; *see also In re Rocky Mountain Helicopters, Inc.,* 186 B.R. 270, 272–73 (Bankr.D.Utah 1995) ("[W]ithout evidence to show that [counsel] was aware or should have been aware from the outset that particular litigation would provide no benefit to the debtor, this court will not deny or reduce professional fees.... It is important to note that this court believes it is imperative that debtors' professionals be free to prosecute or defend their client's position based upon their best professional judgment.").

Redirecting the inquiry from a possible breach of counsel's fiduciary duty to the estate to one of compensation based on services which reasonably benefit the estate avoids the ethical problems counsel otherwise faces in representing the debtor-in-possession. In addition, it focuses the court's analysis on defining what acts would reasonably benefit the estate and hopefully provides more guidance to counsel who endeavor to represent a debtor-in-possession, than evaluating an amorphous fiduciary duty to unknown obligees.

As discussed in Part III(A)(2)(c) above, the principals of the debtor-in-possession are vested with decision-making authority to select and differentiate among the various interests of the estate beneficiaries in their business decisions. Such should be kept in mind in defining which acts of counsel assist the debtor-in-possession in exercising this authority and thus benefit the estate. As one commentator observes,

where there is no actual representation of ownership interests, the courts should analyze the performance of DIP counsel on a benefit basis, rather than disqualifying counsel and denying all compensation. That course is more fair and less likely to chill DIP representation.... [B]enefit must be understood to include the process benefits of competent and effective representation of the DIP. As long as Congress chooses to keep a debtor-driven system, that sort of advocacy is essential to its success. On that basis, a finding of no benefit to the estate should be because of over-litigation of futile or hopeless positions, rather than because the positions taken would benefit the ownership interest as such.[53]

### IV.

In light of the above discussion, the Court reviews the bankruptcy court's denial of compensation for abuse of discretion. *Interwest,* 23 F.3d at 315. The Court in review will set aside the findings of fact made by the bankruptcy court only if they are clearly erroneous, and due regard shall be given to the bankruptcy court's ability to judge the credibility of witnesses. Fed.R.Bankr.P. 8013; *Peterson Distributing,* 82 F.3d at 958.

"Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals....The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails."

*DN Associates,* 3 F.3d at 515 (quoting *In re Martin,* 817 F.2d 175, 182 (1st Cir.1987)).

The Court concludes that the bankruptcy court did not abuse its discretion in denying S & W's fees and expenses prior to the appointment of the Trustee, those incurred from December 4, 1991 to June 11, 1992, but

---

**53.** Jay Lawrence Westbrook, *Fees and Inherent Conflicts of Interest,* 1 Am.Bankr.Inst.L.Rev. 287, 295 (1993).

did abuse its discretion in denying S & W's fees and expenses for services it performed as special counsel to the Trustee from June 12, 1992 through October 31, 1992.

## A. Compensation for Services Performed as Counsel for BPC, as Debtor-in-Possession

Although it is unclear from the orders appealed from which provisions of the Bankruptcy Code and Rules the bankruptcy court specifically relied upon in denying all compensation to S & W, the court generally discusses its power and/or Leta's duties under 11 U.S.C. §§ 327, 328, 329 and 330, as well as Federal Rules of Bankruptcy Procedure Rules 2014, 2016 and 9011. The Court need not agree with every factual finding of the bankruptcy court, but need only conclude that based on the totality of evidence, the bankruptcy court did not abuse its discretion in denying compensation to S & W for its services as counsel for debtor-in-possession. The Court so concludes.

### 1. Magic Valley Settlement

■ First, the Court addresses Leta's conduct relating to the settlement of the Magic Valley claims. The bankruptcy court determined that in urging the settlement of Magic Valley's claims, Leta failed to disclose two important facts to the court:

(1) Some partners of Mayer, Brown & Platt were limited partners of the Magic Valley Partnership. David E. Leta knew prior to the hearing of February 27, 1992, that some Mayer, Brown & Platt partners were financially involved with Magic Valley and that some held limited partnership interests in the project; (2) David E. Leta agreed to and did prepare an opinion letter for the Mayer, Brown & Platt partners who held limited partnership interests in the Magic Valley project. For this work, David E. Leta was paid by his client Mayer, Brown & Platt.

*Bonneville II,* 196 B.R. at 888–89.

S & W does not dispute these findings. Although Leta was aware that seven Mayer, Brown partners were limited partners in Magic Valley and these partners would be paid their pro rata share of the proposed $70,000 to obtain their consent to settlement, when the motion was argued before the bankruptcy court on February 27, 1992, Leta never identified Mayer, Brown's involvement, even though upon the court's approval of the settlement, Mayer, Brown shareholders were to receive money earmarked for the estate. [RT 176–77 (2/19/93)].

Leta and his firm also rendered an opinion for the Mayer, Brown limited partners when they refused to consent without assurance that the settlement would not leave them open to additional liability, and were paid for this service by Mayer, Brown. [RT 161–63 (2/17/93); AA Tabs 31 and 32 at 1491–92]. Leta did not disclose to the court or anyone else involved in the bankruptcy case that his firm rendered this opinion. [RT 163 (2/17/93)].

Although S & W admits these violations of the Bankruptcy Code, it argues that Leta concluded at the time that the Mayer, Brown limited partners' investment in Magic Valley was neither material nor relevant to approval of the settlement: Mayer, Brown was not representing BPC or Magic Valley in the settlement; the Mayer, Brown limited partners were treated no differently than the other 135 limited partners of Magic Valley and their shares were de minimis. [RT 156–58, 159–60 (2/17/93); RT 3–4 (2/26/93)]. Further, S & W states that Leta had one of his partners give the $620 opinion because "(i) the settlement was in the best interests of BPC; (ii) he wanted to get the settlement consummated; (iii) BPC was still scrambling to obtain the necessary limited partner consents; and (iv) the opinion was relatively straight-forward." *Appellants' Opening Brief at 36–37.* S & W contends such de minimus conduct does not mandate disqualification or the draconian fee sanction imposed on S & W.

The Court disagrees. Leta clearly violated Sections 327 and 329 of the Bankruptcy Code. Issuing the opinion for the Mayer, Brown limited partners who were creditors of the estate constitutes a conflict of interest under Section 327. Leta had a duty to disclose this conflict to the bankruptcy court and failed to do so. Failure to disclose con-

nections that even have the potential for creating a conflict can warrant the denial of all compensation to counsel for debtor-in-possession. *See Interwest,* 23 F.3d at 318; *Smitty's Truck Stop,* 210 B.R. at 850. It is not counsel's job to determine if that conflict is significant. That is the court's role. *In re Florence Tanners, Inc.,* 209 B.R. 439, 448 (Bankr.E.D.Mich.1997) (disclosure requirements of § 327 and § 329 not a determination for counsel, but for the court); *In re Granite Sheet Metal Works, Inc.,* 159 B.R. 840, 846 n. 10 (Bankr.S.D.Ill.1993).

 Further, Section 329 and Bankruptcy Rule 2016 required Leta to disclose that Mayer, Brown was the source of payment to him and his firm for the opinion. "[A]n attorney who fails to comply with the requirements of § 329 forfeits any right to receive compensation for services rendered on behalf of the debtor." *Investment Bankers,* 4 F.3d at 1565; *Smitty's Truck Stop,* 210 B.R. at 848. Leta did not supplement his Rule 2016(b) statement as required when in receipt of unscheduled payments. *See In re Lewis,* 113 F.3d 1040 (9th Cir.1997) (affirming bankruptcy court's denial of fees for debtor-in-possession's counsel's failure to supplement Rule 2016(b) statement disclosing post-petition payments).

The characterization of the payment as de minimis does not vitiate counsel's disclosure responsibility. "The disclosure rules are applied literally, even if the results are sometimes harsh. Negligent or inadvertent omissions 'do not vitiate the failure to disclose.' Similarly, a disclosure violation may result in sanctions 'regardless of actual harm to the estate.'" *In re Park–Helena Corp.,* 63 F.3d 877, 881 (9th Cir.1995), *cert. denied,* 516 U.S. 1049, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996) (citations omitted). The disclosure rules impose an independent responsibility upon counsel. "Thus, failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *Id.* at 880; *see In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr.W.D.Okla. 1992) (violation of disclosure rules sufficient to deny all compensation, even if only de minimis).

In this case, Leta violated Section 327 by rendering the opinion for the Mayer, Brown limited partners and failing to disclose the conflict of interest and payment in violation of Sections 327 and 329 and Bankruptcy Rules 2014 and 2016. Based on this alone, the bankruptcy court had discretion to deny all fees counsel incurred while representing BPC as debtor-in-possession.

### 2. Motion to Stay, Disclosure Statement and Plan

In addition, the bankruptcy court found Leta actually represented the interests of the principals of BPC and that representation was a conflict of interest for which he and his firms should not be compensated. Specifically, the court cited the following circumstantial evidence of Leta's conflict of interest: (1) failing to outline the estate's potential claims against insiders for fraudulent transfers, self-dealing, embezzlement and stock fraud; (2) filing a proposed reorganization plan which would have preserved the BPC insiders' control over the Portland General litigation until the entry of a final order equitably subordinating Portland General's claims; (3) seeking a Section 105 injunction of the Portland General suit filed against BPC insiders; and (4) failing to amend the schedule of assets to reflect Buccino's valuation of those assets.

 The Court agrees with the bankruptcy court that representing the principals of the debtor-in-possession would lack the disinterestedness required by Section 327, because counsel for debtor-in-possession owes his allegiance to the debtor-in-possession and not its shareholders, directors, officers, or other constituents. *See Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.,* 57 F.3d 1215, 1229 (3d Cir.1995); *Kendavis,* 91 B.R. at 751; *Office Products,* 136 B.R. at 987.

In the context of Chapter 11, when and if the loyalty shifts from the debtor in possession to the officer, director or shareholder, there may arise the same situation which the drafters of Chapter X sought to prevent; thus, the attorney may be consciously or unconsciously tempted to serve the interests of the insider to the detri-

ment of both the estate and creditors. Obviously, it would be anomalous for the bankruptcy laws to prevent an officer, director or shareholder from exercising total control over a reorganization as insiders, while at the same time permitting an attorney for these insiders to exercise control over the reorganization in the capacity as attorney for the debtor. . . .

Section 327(a), as it affects the debtor in possession, provides the officers, directors and those who are overseeing the reorganization of the debtor with the detached and impartial advice of counsel. One of the roles of an attorney for a debtor in possession is to act, in effect, as a counterweight to the insiders' tendency to favor their interests above others in the reorganization process. This role is consistent with the notion that whatever benefits the officers, directors and shareholders is not necessarily beneficial to the estate, and vice versa. Therefore, in the formulation of a plan of reorganization and in dealing with the affairs of the reorganization in general, counsel must act with the utmost loyalty to the debtor, and hence, to its estate, free from the danger of his loyalties shifting to other parties.

*In re Roger J. Au & Son, Inc.,* 65 B.R. 322, 335 (Bankr.N.D.Ohio 1984), *aff'd,* 64 B.R. 600 (N.D.Ohio 1986).

Section 327(a) requires that counsel for debtor-in-possession be disinterested and not hold an interest adverse to the estate. Section 328(c) authorizes the bankruptcy court to deny compensation to counsel for debtor-in-possession if counsel is not disinterested or holds "an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." 11 U.S.C. § 328(c). The Bankruptcy Code definition of a "disinterested person" includes a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor. . . ." 11 U.S.C. § 101(14).

█ The difficulty with a conflict of interest analysis in cases such as this one in which there is no "actual" representation of an adverse interest is that the bankruptcy court reviews the *conduct of the attorney* for debtor-in-possession for circumstantial evidence of counsel's bias and then determines whether a conflict of interest exists.[54] While the Court does not question the ability of bankruptcy courts to make this determination, it is one which suffers the sharp and critical eye of hindsight, and as noted above, the sanctions for counsel's conflict of interest are harsh. *Interwest,* 23 F.3d at 318.

Consistent with this Court's view of the "fiduciary duty to the estate" theory discussed above, the Court is similarly persuaded that a "benefit to the estate" analysis of counsel's representation of a debtor-in-possession under Section 330 provides a superior

---

54. The Court is aware that the Tenth Circuit in *Interwest* rejected the argument that counsel need have an "actual" conflict to be disqualified under § 327 from acting as counsel for debtor-in-possession. *Interwest,* 23 F.3d at 317–18. Also, the Court sees merit in the *Kendavis* court's reasoning that "whenever counsel for a debtor corporation has any agreement, express or implied, with management or a director of the debtor, or with a shareholder, or with any control party, to protect the interest of that party, counsel holds a conflict," and "[t]hat conflict is not potential, it is actual, and it arises the date that representation commences." *Kendavis,* 91 B.R. at 754.

However, there *is* a difference between counsel having actually represented an adverse interest and having the bankruptcy court conclude in its 20/20 hindsight review of counsel's acts that counsel really represented the principals. It is one of notice. In most cases, counsel will know or should know if he/she has represented or is representing an interest adverse to the interest of the estate, and thus, if counsel proceeds in the representation of debtor-in-possession and/or fails to disclose the conflict, he/she is acting intentionally or negligently in violation of Section 327. But, as the Court has discussed at length in Part III *supra,* counsel has an extremely difficult job representing a client with the inherent conflicts of interest visited on the debtor-in-possession. To add to this burden, counsel has little guidance from the courts. Even a cursory review of decisions determining whether counsel represented the interest of the principals rather than the debtor-in-possession reveals considerable disagreement as to what conduct establishes counsel's conflict of interest. *Compare In re Kendavis Ind. Int'l, Inc.,* 91 B.R. 742 (Bankr. N.D.Tex.1988) *with In re Office Products of America, Inc.,* 136 B.R. 983 (Bankr.W.D.Tex.1992).

analytical framework to an "adverse interest" or "conflict of interest" analysis under Section 327. The Court finds the bankruptcy court's discussion of these two analyses in *In re Office Products of America, Inc.*, 136 B.R. 983, 987 (Bankr.W.D.Tex.1992) to be particularly instructive.

Like the instant case, the bankruptcy court in *Office Products* had for decision whether counsel for debtor-in-possession represented the interests of the principals of the debtor over those of the estate. Counsel represented the debtor in its reorganization effort under Chapter 11 until the court concluded the plan was not in the best interest of creditors and placed the debtor into Chapter 7 liquidation proceedings. The trustee and creditors objected to counsel's fee application arguing that counsel was not "disinterested" and had an impermissible conflict of interest in representing the debtor and its principals and/or shareholders. *Id.* at 985. The court found that the reorganization plan proposed by management could "redound only to the benefit of the owners of the enterprise and not to its creditors" as it "shifted virtually all the risk of nonpayment onto unsecured creditors who, under chapter 7, were looking to a pot of cash for certain payment within a relatively short time frame." *Id.* at 986. However, noting that such a plan could only succeed if forced on creditors under the "cram down" provisions of § 1129(b), the bankruptcy court rejected the trustee's argument that proposing this plan in the face of creditor opposition was a conflict of interest justifying denial of fees:

> There are serious policy ramifications to such a holding, however, which auger against deciding the case on that basis. The cramdown provisions of the Code are an expression of congressional intent regarding the importance of reorganization values even in the face of considerable creditor opposition, provided those creditors' interests are appropriately protected. H.Rep. No. 595, 95th Cong., 1st Sess. 220–21, 416–18 (1977). Were we to hold here that pursuing those goals over the objections of creditors in and of itself created a conflict of interest, lawyers would be discouraged from even representing debtors in the face of creditor opposition (even if

the plan could pass muster under § 1129(b)), for fear of not being paid.

> Such a result is so antithetical to the structure of the reorganization chapters that we must retreat from such a harsh ruling.

*Id.* at 986–87.

The court also rejected the trustee's related argument that counsel had an impermissible conflict of interest which resulted from its representation of both the debtor-in-possession and the principals. Citing Rule 1.12(a) of the Texas Disciplinary Rules of Professional Conduct (Model Rule 1.13), the court acknowledged that counsel's allegiance was to the corporate entity and not the principals. However, the court refused to make a finding of dual representation.

> Certainly the facts of this case suggest that [counsel's] true client was the officers and directors of OPA. They certainly stood to gain the most from the plan they proposed, and stood to lose the most from the conversion of the case. A court could no doubt find on these facts ... that [counsel] had a conflict of interest which now bars any entitlement to fees. Kendavis, supra. This court, however, is reluctant to make such a finding absent more compelling facts than those presented here. A finding of conflict of interest, while no doubt the responsibility of any judge where the facts so warrant (a responsibility which should not be shirked, no matter how painful its exercise), should nonetheless not be lightly made. There is an inevitable in terrorem effect that accompanies any such ruling, which just as inevitably discourages competent and honest counsel from accepting such representations in the first place, or from diligently discharging their duties for fear of reprisals later in the case. Such a ruling should be reserved for cases where the facts developed at trial establish the conflict of interest with more clarity and more certainty than do the facts here.

*Id.* at 988.

Instead of a conflict of interest analysis, the court chose to evaluate counsel's representation under Section 330.

The principle significance of Liberty Trust[55] and Citrone Development[56] for our facts is not so much whether the attorneys in those cases had a conflict of interest, but that the services they rendered did not benefit the estate. The distinction may seem slight, but it is nonetheless one with a difference. The focus is turned away from who is represented and toward who is benefitted; whether the services were actual and necessary for the pursuit of a legitimate reorganization within the contemplation of the Bankruptcy Code.... In our earlier discussion of the trustee's conflict of interest objection, we observed that zealous representation of the debtor in its pursuit of reorganization over the objections of a significant body of creditors might chill a debtor's ever trying to employ § 1129(b) (the cramdown provisions) if in the process, such a pursuit were deemed to evidence a conflict of interest. Here, on the other hand, we evaluate whether the proposed plan would have met even the standards of § 1129(a), which is the sine qua non for confirmation of any plan, regardless of creditor opposition. See 11 U.S.C. § 1129(a) (court may confirm a plan only if all requirements of that section are met). This section spells out the minimums for a plan that represents a legitimate effort at reorganization, that operates in the best interests of the estate and its creditors. If it does not, then we are right to ask whether any benefit has been conferred on the estate in pursuing the plan in the first place, if it is clear from the context of the case that the debtor and its counsel knew or should have known from the outset that the plan could not satisfy the requisites of § 1129(a).

*Id.* at 990.

Applying a "benefit to the estate" analysis, the Court concludes neither the motion to stay the Portland General litigation nor the disclosure statement and proposed plan benefited the estate.

■ Portland General brought suit in Utah state court against BPC directors Wood, Johnson, and Dunlop, and BPC's Vice–President of Accounting, Monson, individually, (and Deloitte, BPC's accounting firm) alleging insider fraud and malfeasance. [AA Tab 20]. None of the claims were against BPC or any of its affiliates. In spite of this, Leta sought to enjoin the Portland General suit for "tactical" reasons. He put on testimony from Mower at the injunction hearing that Wood, Johnson and Dunlop were the "collective memory" of BPC and thus essential to reorganization efforts. [RA Tab 7 at 113–14; RT 5–7, 10–11 (2/18/93 a.m.); RT 88 (2/24/93); Supp. AA Tab 2 at 47–51]. He argued the suit against these insiders and unnamed defendants caused significant unrest among the defendants and other BPC employees, and the resulting discovery would divert their attention from formulating a plan. [RT 125, 172–73, 188–90 (2/17/93)]. Leta also argued that the litigation should be stayed because BPC was concerned about possible indemnification claims by the officer-defendants under its articles, by-laws, and employment contracts. [RT 173 (2/17/93); AA Tab 22 at 1405–06]. Leta further explained that BPC intended to bring its own suit against Portland General and discovery could then be coordinated.

Seeking to enjoin a state court action against nondebtors under 11 U.S.C. § 105 is an extraordinary remedy. *See, e.g., In re Eagle–Picher Ind., Inc.,* 963 F.2d 855 (6th Cir.1992); *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). The reasons given by Leta for enjoining Portland General's suit were of inconsequential benefit to the estate in comparison to the protection indisputably accorded the insider defendants.

■ This protection would have continued under the reorganization plan proposed by Leta on behalf of BPC. The plan required the entry of a final order equitably subordinating Portland General's claim before the plan would become "effective." [AA Tab 40 at 1864 and 1874–75]. Although Wood, Dunlop and Johnson had re-

---

55. *In re Liberty Trust,* 92 B.R. 706 (Bankr. W.D.Tex.1988).

56. *In re Citrone Develop. Corp.,* 106 B.R. 359, 360 (Bankr.S.D.N.Y.1989).

signed at the time the plan was filed, the plan promoted business as usual with BPC's current management continuing to act on behalf of the debtor-in-possession until the plan became effective. [AA Tab 40 at 1864]. Preserving the status quo, *i.e.*, continued management by insiders, in the bankruptcy proceeding for an indeterminate period of time allowed the possibility that claims against insiders would not have been pursued in a timely manner, if at all. Indeed, in his report filed ten days after the proposed plan, the examiner concluded

> it is doubtful that the Company would vigorously pursue causes of action against former management, some of whom apparently continue to have certain influence on members of current management. It is also questionable whether the Company would seek recovery of preferences or fraudulent conveyances against counsel with whom the Company continues to maintain an ongoing business relation.[57]

[AA Tab 43 at 2353–54].

Curiously, during this undefined period of time between confirmation of the plan and the entry of a final order equitably subordinating Portland General's claim (the "Effective Date" of the plan), BPC's management would operate the business and administer the estate as debtor-in-possession free of certain protective restrictions granted to creditors under the Bankruptcy Code. Section 7.4 of the plan states that "[a]s of the Confirmation Date, the Committee shall be dissolved and shall cease to exist." [AA Tab 40 at 1865]. Therefore, there would be no creditors' committee overseeing BPC's administration of the estate, including BPC's pursuit

of its claims against insiders, from the date of plan confirmation until the Effective Date. In addition, Section 7.6 permits BPC to employ professionals to assist in the "consummation of this Plan" in its discretion and "compensation of such professionals shall be paid in the ordinary course of business as a post-confirmation expense." [AA Tab 40 at 1866]. Thus, during this same period of time, BPC would determine the qualification and compensation of professionals, presumably without court approval, including those who would assist in electing whether or not to pursue insider claims. Clearly, the proposed plan did not benefit the estate.

 Finally, the disclosure statement certainly did not provide "adequate information ... that would enable ... interests of the relevant class to make an informed judgment about the plan," as required by 11 U.S.C. § 1125. The liquidation analysis contained in the disclosure statement is neither helpful nor complete. Although Leta was aware of the findings of the Harris Report, no information discovered by Harris is disclosed in the statement. The only reason cited as the cause of BPC's bankruptcy was Portland General's withdrawal of financial support. There is no discussion of Dunlop's admitted million dollar defalcation or explanation for the resignations of Dunlop, Johnson and Wood. There is no disclosure of $859,173.44 in prepetition transfers to insiders. The statement does not disclose that many of BPC's subsidiaries and affiliates were worthless and used to inflate the value of assets. In sum, the disclosure statement was wholly inadequate under § 1125, and thus of no benefit to the estate.

---

57. The examiner found no wrongdoing on the part of Leta and S & W pertaining to the insider fraud. The record supports his finding. While the record may permit the conclusion that Leta was not as diligent in investigating insider fraud as the bankruptcy court might have expected, the record does not support the conclusion that Leta was in collusion with such defrauders. The corporate structure of BPC was quite complex, with its myriad of domestic and foreign subsidiaries and affiliates. The Examiner's Report noted the "steep learning curve" required by this case. [AA Tab 42 at 2038]. Early on, Leta was justified in relying upon BPC's newly appointed president, Mower, a principal of BPC as debtor-in-possession, whose views and opinions ultimately proved erroneous in many material respects regarding insider fraud. Leta was new counsel to the debtor-in-possession for six months, December 1991 to June 1992, before being replaced by the Trustee. Over those six months, for six weeks in March–April 1992, serious consideration was being given by BPC to replacing Leta as counsel, and during this time Leta was not privy to important meetings and communications. Once the examiner was appointed by the court in late April 1992, Leta, while cooperating, was justified in suspending any internal investigation, awaiting results of the examiner's report. Thus, Leta was in charge as counsel for BPC for internal investigation purposes for only the initial three of the six months.

Further, given the bankruptcy court's clear admonition to Leta concerning the filing of an incomplete and unconfirmable plan to protect the exclusivity period, the Court concurs with the bankruptcy court that the disclosure statement and the proposed plan were not filed in good faith. [RA Tab 8 at 190; AA Tab 17 at 762–63]. *See* 11 U.S.C. § 1129(a)(3).

### 3. Failure to Amend Schedule of Assets

■ The bankruptcy court found that Leta improperly filed an amended schedule of assets on April 10, 1992 overstating the value of BPC's assets by more than $200 million compared to the valuation made by Buccino on January 28, 1992. S & W does not contest the discrepancy between the value of BPC's assets as assessed by Buccino in January 1992 and that stated in the original December 20, 1991 and amended April 10, 1992 schedules of assets. Rather S & W asserts the valuation in both schedules reflected the book values of BPC's assets and not the market values called for by the bankruptcy forms, and was clearly stated as such in the original schedules. [RT 89–90 (2/17/93); AA Tab 18 at 819]. S & W explains that the book values were used and expressly disclosed in the schedules because the historical carrying values were the best assessment of BPC's assets at the time of the original disclosure. Further, S & W asserts the April 10, 1992 amendment did not relate to assets as it modified only claim information. [AA Tab 36; RT 101–02 (2/18/93 a.m.)]. BPC did not amend the original asset schedules to reflect Buccino's January 1992 assessment as that assessment was already given to the creditors' committee and no party in interest moved for an order requiring the schedules to be amended under Bankruptcy Rule 1009(a). [RT 103 (2/18/93 a.m.); RT 157 (2/23/93 p.m.)].

What S & W overlooks is Leta signed and filed the amended schedules which he knew, based on Buccino's earlier assessment, overstated BPC's assets, and failed to disclose the substantial difference between the book value and the recent Buccino appraisal, a discrepancy in excess of $200 million. In filing amended schedules, Leta had an obligation to disclose current appraisal information. By signing schedules containing the inflated book value rather than the most current appraisal value, Leta represented that the inflated value was true and accurate at a time when he knew such was not "well grounded in fact." This was clearly a violation of Bankruptcy Rule 9011. *See In re Cascade Energy & Metals Corp.*, 87 F.3d 1146, 1151 (10th Cir.1996).

■ Once a violation of Rule 9011 is found, the imposition of sanctions is mandatory. Fed.R.Bankr.P. 9011. Leta's belief that Buccino's disclosure of its assessment of BPC's assets to the creditors' committee in January 1992 was sufficient to render the schedules not misleading does not protect him from sanctions under Rule 9011. Subjective good faith is not enough to protect an attorney from sanctions under Bankruptcy Rule 9011; an attorney's conduct is evaluated under an objective standard to determine what a reasonable, competent attorney would have done. *See White v. General Motors Corp., Inc.*, 908 F.2d 675, 680 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991) ("A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances."). Once amended, the schedules should have disclosed the current valuation of BPC's assets to the bankruptcy court, the United States Trustee, the creditors' committee, creditors not on the committee, and the public.

The Court thus concludes that the bankruptcy court's reliance on Rule 9011 as one of the bases for its sanction is not an abuse of discretion. *See Cascade Energy*, 87 F.3d at 1149.

### B. Compensation for Services Rendered as Special Counsel to Trustee

■ After reviewing the Examiner's Report, the bankruptcy court's decision to ap-

point a trustee was clearly called for and demonstrated judicial sagacity on the part of the court.[58] Once the Trustee was appointed, he requested the bankruptcy court appoint Leta and his firm, S & W, as special counsel to the Trustee, effective June 12, 1992. The court approved their employment as special counsel.

It is undisputed that Leta and S & W performed the transition services for which they were appointed and the Trustee considers the fees and costs incurred by S & W for the services rendered from June 12 through October 31, 1992 in the amount of $71,765.23 to be reasonable and proper. [AA Tab 48]. S & W also contends that it is entitled to fees and costs for services it performed from November 1 through November 30, 1992. S & W was precluded from submitting an application for the November fees and costs by the bankruptcy court's ruling on November 30, 1992 that all compensation be denied S & W as a sanction for its inadequate representation of BPC as debtor-in-possession. S & W thus reserves the right to seek compensation for its November services pending the outcome of this appeal.

The Court finds the bankruptcy court abused its discretion in denying S & W compensation for services it performed as special counsel to the Trustee. The court failed to distinguish S & W's two different roles—as counsel for debtor-in-possession and as special counsel to the Trustee. The court's sanction was based on Leta's performance of his duties as counsel for BPC, not as special counsel to the Trustee, yet the court denied all compensation. While the "Bankruptcy Code certainly does not allow attorneys to change hats at their own whim," when the court approved S & W's employment as special counsel to the Trustee, S & W was no longer representing BPC, and the services it performed "were at the express direction of the trustee and therefore were most certain-

ly performed in the capacity of trustee's attorneys, not of debtor's attorneys." *In re TS Industries, Inc.*, 125 B.R. 638, 642 (Bankr. D.Utah 1991). As such, it was an abuse of discretion for the bankruptcy court to deny fees for S & W's services as special counsel to the Trustee as part of the sanction it imposed based on Leta's performance of his duties as counsel to BPC.

From the Court's review of the pertinent fee applications for S & W as special counsel to the Trustee, the Court is inclined to agree with the Trustee that the fees and costs requested for services performed from June 12 through October 31, 1992, less the disputed amount for the appeal of the appointment of the Trustee of $14,628, for a total amount of $71,765.23, seem to be reasonable and proper. However, that determination, as well as the reasonableness and necessity of fees and costs requested in any subsequent application to the bankruptcy court for services performed in November 1992, are decisions for the bankruptcy court.

## V.

In accordance with the above, the Court affirms in part and denies in part S & W's appeal of the bankruptcy court's December 1, 1992 and May 22, 1996 Orders. The Court affirms the bankruptcy court's order of disgorgement and denial of fees and costs from December 4, 1991 through June 11, 1992. The Court reverses the bankruptcy court's denial of S & W's fees and costs as special attorney to the Trustee from June 12, 1992 through October 31, 1992. The Court remands the case to the bankruptcy court on the narrow issue of the amount, reasonableness and necessity of fees and costs incurred by S & W from June 12, 1992 through November 30, 1992 as special counsel for the Trustee.

---

58. *See Appendix A* for a breakdown of the settlement amounts recovered by the Trustee at the time the Trustee filed his response brief. At the time of appellate oral argument on July 8, 1997, counsel for the Trustee represented to this Court that the Trustee had as of that date recovered $186 million from insiders and professionals involved in the BPC bankruptcy. [Transcript of Oral Argument, pp. 60–61].

## APPENDIX A
### RECOVERIES (SETTLEMENTS) THRU MAY 22, 1997

| Name of Setting Parties | Relationship with Bonneville | Settlement Amount |
|---|---|---|
| Deloitte & Touche | Accountants | $ 65,352,324.64 |
| Mayer, Brown & Platt | Attorneys | $ 31,932,579.98 |
| Kidder Peabody | Consultant/Underwriter | $ 15,000,000.00 |
| Perkins Coie | Attorneys | $ 12,750,000.00 |
| Fraser & Beaty (Bradley) | Attorneys | $ 10,000,000.00 |
| Piper Jaffray | Consultant/Underwriter | $ 10,000,000.00 |
| Westinghouse | Lendor | $ 6,950,000.00 |
| Parsons, Behle & Latimer | Attorneys | $ 6,901,030.21 |
| Norwest Bank | Lendor | $ 5,000,000.00 |
| Yanke/Dinuba Energy | Seller–Dinuba Project | $ 4,500,000.00 |
| Carl T. Peterson | Insider | $ 4,007,694.07 |
| German Entities | Business Assoc. | $ 2,100,000.00 |
| L. Wynn Johnson | Insider | $ 1,781,713.00 |
| Hanifen Imhoff | Underwriter | $ 1,757,197.05 |
| Robert Wood | Insider | $ 1,080,975.00 |
| Raymond Hixson | Insider | $ 1,015,770.00 . |
| Corradini/Ross | Various | $ 803,303.11 |
| Calpine | Business Assoc. | $ 767,500.00 |
| Robert Pratt | Former President | $ 675,000.00 |
| Houlihan-Dorton | Appraiser | $ 533,264.99 |
| Mark Rinehart (Natl.Union) | Attorney | $ 400,000.00 |
| Stephen Nadauld | Former CFO | $ 260,250.00 |
| David Hirschi | Insider | $ 65,154.59 |
| Jack Dunlop | Insider | $ 13,433.25 |
| Brent Haymond | Business Assoc. | $ 10,000.00 |
| **TOTAL** | | **$183,657,189.89** |